United States Court of Appeals
Fifth Circuit

**F I L E D**

April 21, 2004

Charles R. Fulbruge III
Clerk

REVISED JUNE 16, 2004

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 98-20385

---

MAX ALEXANDER SOFFAR,

Petitioner-Appellant,

VERSUS

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondents-Appellees.

---

Appeal from the United States District Court
For the Southern District of Texas

---

Before EMILIO M. GARZA, DeMOSS, and DENNIS, Circuit Judges.

DeMOSS, Circuit Judge:

This case returns to us upon reinstatement by the *en banc* Court, Soffar v. Cockrell, 300 F.3d 588 (5th Cir. 2002) ("Soffar II"), of the original panel's grant of a Certificate of Appealability ("COA"), Soffar v. Johnson, 237 F.3d 411 (5th Cir. 2000) ("Soffar I"), as to Petitioner Max Alexander Soffar's claims that (1) he did not have effective assistance of counsel in the guilt phase proceedings, and (2) his right to counsel was violated

by police interrogation regarding an extraneous offense after he had been charged with capital murder and had requested and received appointed counsel, when that interrogation was later used to obtain a death penalty at the penalty phase.

For the reasons stated herein, we reverse the district court's order granting the Director's motion for summary judgment and remand this case to the district court for entry of an order (i) granting Soffar's application for writ of habeas corpus, (ii) setting aside Soffar's conviction and sentence for capital murder, and (iii) ordering Soffar's release unless the State commences a re-trial of Soffar within 120 days. This current opinion will be sometimes referred to herein as Soffar III.

As a brief overview, this opinion addresses three fundamental aspects of Soffar's first claim before us here, i.e., his ineffective assistance of counsel claim. First, as has been discussed and developed on previous occasions, Soffar's conviction was based indispensably on the statements taken from him by police after three days of interrogation and without an attorney present. Importantly, the single known eyewitness was neither contacted by defense counsel nor called to testify; and except for the facts recited in Soffar's confession, which could have been controverted by that uncalled eyewitness, there was no physical evidence, circumstantial evidence, or other evidence that connected Soffar to the crime. Second, we address the State's argument that Soffar's claim of ineffective assistance of counsel was neither properly

2

exhausted in his state habeas petition nor properly raised in his federal habeas application. As we will detail below, specific and unambiguous language in the court documents submitted by Soffar's habeas counsel reveal that Soffar's ineffective assistance of counsel claim was properly exhausted in the state courts and properly raised before the district court. Finally, as to the merits of Soffar's ineffective assistance of counsel claim, for a litany of reasons bolstered by ample evidence in the record, we conclude that Soffar was denied the constitutional protections afforded by the Sixth Amendment and defined by Supreme Court precedent.

## I.  BACKGROUND AND PROCEDURAL HISTORY

We start with the facts of the case presented in a substantially similar form as in our original opinion in Soffar I. The facts are taken primarily from the facts found by the state and federal habeas courts. However, we also have included additional relevant facts that we have found to be undisputed based on our independent and exhaustive review of the entire record of this case.

## A.  The Offense

In either the late evening hours of Sunday, July 13, 1980, or the early morning hours of Monday, July 14, 1980, four young people were each shot in the head during the course of a robbery at the Fairlanes-Windfern Bowling Alley, located at 14441 Northwest

3

Freeway, approximately 13.5 miles northwest of downtown Houston, Texas. The victims who were killed were Stephen Allen Sims, a young male who was the assistant manager of the bowling alley; Tommy Temple, a young male employee of the bowling alley; and, Arden Alane Felsher, a young female non-employee. Gregory Garner, another young male employee of the bowling alley, was the only victim who survived.

On the night before the robbery-murders, the Fairlanes-Windfern Bowling Alley had been burglarized.[1] The side door of the bowling alley, which was broken by the burglars to gain entry the night before, had not been fixed by the next evening and could not be locked. As a result, at around 7:30 p.m. on the night of the 13th, Jim Peters, the manager of the bowling alley, asked Garner and Temple, to stay late after closing to keep an eye on the premises, at least until the early morning cleaning crew arrived at approximately 4:00 a.m. At approximately 9:30 p.m., Garner moved his car across the street into the parking lot of the Houston First Church of God, which was directly across the Northwest Freeway[2]

---

[1] At the time of the robbery-murders in this case, two of the four suspects from the previous night's burglary of the bowling alley were still at large, though they were apprehended within a day or two of the robbery-murders. The other two suspects had already been arrested for the burglary. The four youths who were involved in the burglary the night before subsequently disavowed any knowledge of, or association with Soffar or his alleged accomplice Latt Bloomfield.

[2] At that time, the Northwest Freeway was a four-lane, divided highway with two one-way outbound lanes (which the church fronted), separated by a grassy median from the two one-way inbound lanes

4

from the bowling alley, so that after closing it would appear that no one was at the bowling alley. Just as the bowling alley closed, a robber or robbers entered the bowling alley, shot the four individuals, and absconded with approximately $1,000 in cash. Garner was the only victim who survived; the other three victims died at the scene.

Shortly after the robbery ended, at approximately 12:08 a.m., Garner, although seriously wounded, managed to get up from the floor and telephone his mother, Nellie Garner, from the control booth next to where he and the other victims were lying. He relayed to his mother that someone had been at the bowling alley and that he needed help. His mother told him that she was sending his father, Ira Garner, to the bowling alley and she asked her son if he was all right. After Garner responded "yeah, I'm all right," the bowling alley's other phone line rang and Garner told his mother that he was putting her on hold. The other caller was Peters, who was calling to check and make sure that everything was in order at the bowling alley. Peters testified that Garner's speech was garbled but that Garner told Mr. Peters either "we, he, or they" made us lay down. Peters, sensing that something was awry, told Garner that he was going to call the police. After Peters called the police, he started on his own trip to the bowling alley. When Garner returned to the phone line with his mother, he

(which the bowling alley fronted).

5

told her again that he was all right and that the robber or robbers had just left. He answered his mother's questions by telling her that he was bleeding from the side of his head and that he was holding his eyeball. Mrs. Garner then hung up the phone and headed towards the bowling alley.

After he hung up the phone with his mother, Garner moved over and lay down next to the female victim Felsher, who was the only other person still alive at the time. When he lay down next to Felsher, he was positioned as the victim closest to the front door of the bowling alley, just inside the doors. Garner's father was the first to arrive at the scene. When he arrived, he parked his car in front of the building with his headlights facing the front door. This illuminated the inside of the bowling alley and he saw four people lying on the floor. When he honked his horn, he could see his son lift his head and it was immediately apparent to him that Garner was injured. He ran inside, comforted his son, and then tried to telephone for help from the bowling alley phone. He was unable to make the call because he could not get an outside line. He then drove across the freeway to the church and asked a woman, who had gathered with several others awaiting the return of their children from a church youth trip, if she would call the police. He then returned to the bowling alley.

As Ira Garner described the scene, his son was closest to the door on his stomach; Felsher was lying on her stomach, still alive, next to his son; Sims was lying dead on his stomach next to

6

Felsher; and Temple was lying dead on his stomach on the other side of Sims.  The first three victims were lying closer to the control booth where the cash register was located, and Temple was located closer to the concession area.[3]  Photographs of the crime scene indicate that, in general terms, Felsher's, Sims's, and Temple's bodies were positioned in a somewhat semi-circular array, with a greater distance separating Temple from Sims.  Garner was found aligned next to Felsher, but as discussed below, by his own account, and consistent with a bullet hole found in the carpet between the bodies of Sims and Temple, he was lying between Sims and Temple when he was shot, thus filling the gap in what would have been a fully semi-circular configuration at the time of the shootings.

---

[3] Physically, the bowling alley was set up as follows.  As one entered the two sets of glass front doors, a concession area/snack bar was to the left, and the main control booth/cash register area was located on the right, approximately 8 feet from the front doors.  Temple's body was found approximately 15 feet from the left set of front double doors, with his head pointed towards the snack area to the left.  Garner's body was found just inside the right set of front double doors with his head pointed somewhat towards the front doors-he was located just at the front corner of the control booth with his feet roughly perpendicular to the booth. Beyond him was the body of Felsher, who was lying approximately 11 feet inside the right set of doors, next to, and perpendicular to the control booth, with her head pointed in the direction of the snack bar.  Just beyond Felsher, Sims's body was found approximately 14 feet inside the right set of doors, with his feet positioned next to, and perpendicular to the area of the control booth with swinging doors providing access to the cash register, but his torso was angled towards the front doors.  While Temple's and Sims's bodies were roughly equidistance from the front doors, more than 8 feet separated their bodies along the left to right dimension of the bowling alley.  Just beyond the feet of Temple's body were the seats in front of the individual bowling lanes.

7

After Ira Garner had arrived back at the scene, Jim Peters arrived, and he was followed shortly thereafter by Mrs. Garner. Additionally, two men from the church across the street arrived at the scene to assist. Felsher was flipped over onto her back to clear her airway because according to those present, she was gurgling blood. Police and medical personnel arrived at the scene shortly thereafter. Dr. Daniel Bethingcord, a second-year resident from Hermann Hospital, was a member of the life-flight team of medical personnel that arrived later at the scene by helicopter. He directed efforts taken over from the fire department EMS personnel to resuscitate the only two living victims found on arrival, Felsher and Garner. Felsher was given priority of treatment because of her critical condition. All efforts to resuscitate Felsher were unsuccessful and she was pronounced dead at 1:40 a.m.

Dr. Bethingcord then turned his efforts to treating Garner, who had previously been determined to be in more stable condition. Dr. Bethingcord thought Garner had suffered from two gunshot wounds to the head, but it was "difficult to tell which was the entrance and which was the exit." In fact, it was later determined by Dr. Phillip Gildonburg, the neurosurgeon who performed surgery on Garner at the hospital, that the bullet which hit Garner entered just above and in front of his left ear, and exited just below his left eye. The bullet also caused some skull fragmentation resulting in embedded bone fragments in a small portion of Garner's

8

brain. As result of his injuries, Garner ultimately lost his left eye.[4] Once Garner had been airlifted to the hospital, the police began their investigation of the crime scene in earnest.

Autopsies later revealed that the victims suffered the following injuries. Temple suffered a gunshot wound to the head which entered the back of his head on the left side and the bullet remained lodged in his right ear, never exiting his body. Sims suffered a gunshot wound to the head that entered the back of his head on the left side and which exited his left cheek; he also

---

[4] Dr. Gildonburg testified at Soffar's trial during the State's case-in-chief regarding Garner's injuries. He also testified that, in his medical opinion, it was "possible" that Garner's injuries could have caused him to suffer from a condition known as retrogressed amnesia. This condition, according to the doctor, results when the portion of the brain which classifies and stores recent memory suffers trauma from a concussion. When such a concussion occurs, memory of events immediately preceding the trauma can be temporarily, and in severe cases, permanently "wiped out." The more severe the trauma, the farther back in time preceding the trauma might the memory loss be. The doctor conceded that it is possible that all memory would return and that none would be lost. Dr. Gildonburg also testified that Garner's ability to speak was not affected by his injury. Aside from Dr. Gildonburg's testimony, no other explanation for Garner's absence as a witness, either for the State or the defense, was presented. As the Texas Court of Criminal Appeals noted on direct review of this case, "[a]mazingly, the State presented no direct testimony or evidence at [Soffar's] trial that would have accounted for Garner's absence at trial." Soffar v. State, 742 S.W.2d 371, 373 n.1 (Tex. Ct. Crim. App. 1987) (en banc). We pause here to note that what most accurately accounts for the State's failure to call Garner as a witness, as will be discussed infra, is the fact that Garner's account of the details of the robbery and shootings differs radically from the account of events put forth in Soffar's confessions. If Garner had testified at trial consistent with the various statements he made to the police, his testimony would have significantly undermined the credibility and accuracy of Soffar's confessions.

9

suffered surface wounds on the front of his chest which resulted from bullet fragmentation. Felsher suffered a gunshot wound to the head which entered the front of her face just under her right cheek and which exited near the rear center of the top of her head. As stated above, Garner suffered a gunshot wound to the head that entered the side of his head just in front of and above his left ear and which exited his left cheek, just below his left eye. Gunshot wounds were ruled the causes of Temple's, Sims's, and Felsher's deaths.

## B. The Investigation

The crime scene itself was most aptly described at Soffar's trial as "contaminated" in the sense that medical personnel attempting to resuscitate Felsher and Garner disturbed the positioning of their bodies and left debris scattered throughout the area surrounding the bodies. Additionally, Garner's parents, the bowling alley manager, and two men from the church across the street entered the crime scene, moving items around and touching crucial areas of the crime scene. The forensic technicians testified that they had a difficult time recovering very many usable fingerprints. Despite this fact, several fingerprints and one palm print were lifted from the area surrounding the cash register. It was later determined that none of these fingerprints matched the fingerprints of either Soffar or Latt Bloomfield,

10

Soffar's alleged accomplice.[5]

Investigating officers who questioned those present at the crime scene determined that there was no eyewitness to the shootings, except for Garner. However, one individual by the name of Frank Karibus told a Houston homicide detective, G.J. Novak, that from his vantage point across the street at the church several hundred yards away, he had seen someone running from the bowling alley and getting into a small brown car, possibly a Honda. He initially described the individual as 5'-8" to 5'-9" with blonde shoulder length hair, but later gave a varying description of the individual he saw. Karibus was never called as a State witness to identify Soffar. Melvin Neal, the youth pastor at the church testified that it would be virtually impossible to specifically identify any individual at night from across the highway.

Investigating officers also learned from pastor Neal that the church had been burglarized in the late evening hours of that same night as well. At some point that evening, entry was made into the church through a pried open door and the church's main office had been broken into and ransacked. Crime scene investigators were dispatched and attempted to lift fingerprints from the church as well.

---

[5] Latt Bloomfield, the son of a Houston police detective, was an associate of Soffar. Bloomfield was detained for these murders based on Soffar's statements, but, according to the authorities, he was released shortly thereafter because of the lack of evidence. He has never been charged with any offense relating to this incident.

11

During the night of the murders, an interested and curious local citizen, Richard Civitello, who came to the scene sometime after he heard about it on his police scanner, pulled into the parking lot and saw a billfold in the path of his headlights. He stopped, picked it up, and turned it over to investigating officers at the scene. That wallet belonged to Steven Sims. The very next day, a truck driver by the name of Andrew Davis, passed by the bowling alley on the inbound lanes of the Northwest Freeway. Traffic was bogged down, and as Davis looked out of his window he noticed a billfold on the pavement next to the grassy median separating the inbound and outbound lanes, approximately 100 yards from the bowling alley. The wallet was on what would be the driver's side of an inbound vehicle. He pulled over so that he could walk back and retrieve the wallet he had seen. On his way back he spotted a second billfold in the same area. One of the wallets contained some money and both contained various other papers. Based on the information contained on the identification cards in the wallets, Davis tried to contact Garner but was initially unsuccessful. He eventually reached Ira Garner, who informed him that the wallet belonged to his son, who had been shot in a robbery the night before. After learning this, Davis called the police and turned the wallets over to one of three officers who, the next day, accompanied him back to the location where he had found the wallets.

Forensic evidence obtained from the crime scene the night of

12

the murders, and during subsequent investigations of the crime scene yielded the following evidence. Four bullet holes were found in the carpeting of the bowling alley. One hole, which contained a large fragment representing the remainder of a bullet, was located just above the area where Felsher's head was originally positioned. A second bullet hole, also containing a large fragment was located at or just below the location of Sims's head. A third, elongated hole was located near Sims's body, closer to his torso, accompanied by a dent in the padding of the carpet. A fourth hole located to the right of Sims's head contained a bullet embedded in the padding of the carpet. No bullet hole was found anywhere near Temple's body, because the bullet which killed him never exited his body. And no bullet hole was found anywhere near where Garner was found lying either. Rather, the extra bullet hole, which was not closely aligned with any victim's exit wound as the bodies were found, was between Sims's and Temple's body, where Garner was lying when shot, and plausibly represented the point of exit from Garner's head.[6]

---

[6] This fact is particularly significant, because as noted _infra_, Garner stated to the police that he was lying between Sims and Temple when he was shot and that his position closest to the door resulted from his having moved from between Sims and Temple to a position between the front doors and Felsher after he got up and called his mother. Also, as noted _infra_, Soffar's confession recites that the victims were shot in the order in which they lay when they were discovered; that is, male, female, male, male, and not female, male, male, male as Garner repeatedly explained the shootings to police. The importance here lies in the fact that the ballistics evidence better supports Garner's account of the body positions at the time of the shootings than it does Soffar's

13

Homicide detectives pursued all available leads to the fullest extent, but had little success. The news media reported widely on the police investigation and reported all pertinent details as they became available from the police. For example, as early as the day after the shootings, the press reported that the bowling alley had been burglarized the night before, that four victims were shot in the head, execution style, with the males being shot in the left side of the backs of their heads, and the female shot in the cheek, that wallets were found near the scene, and that money was taken from the register. The press also reported on the $10,000 reward being offered by the Fairlanes Company, and later that the reward was increased to $15,000 by a private donor.

At the scene, Garner was unable to make any statement to aid in the police investigation. He underwent more than seven hours of surgery the morning of July 14th and remained in critical condition for several days. However, as his condition was improving by July 17th, Garner's treating physician advised the homicide detectives that Garner was independently remembering details of the offense and was alert enough to briefly speak with detectives. Over a period of four days, Garner spoke with homicide detectives on four separate occasions, and each conversation was both tape recorded

---

confession. These and other inconsistencies between Soffar's confession and Garner's account of events are discussed in Part I.D. <u>infra</u>, and are summarized in **"Appendix A"** to this opinion.

and transcribed by the police.[7]  The essence of each of Garner's interviews with the detectives is abstracted as follows:

### i.  Garner's July 17, 1980, Statement

On the morning of July 17, 1980, Garner gave his first taped interview with Houston homicide detectives Miland Kardatzke and Gil Schultz.  This first interview occurred only three days following his surgery and was relatively brief.  The dialogue contained in the transcript is direct in that the detectives did not employ either leading or suggestive questions.  However, in this first interview, which had to be cut short, Garner's responses can at times best be described as garbled, but he was nevertheless able to relay to the detectives the following basic information.

At the time of the robbery there were four individuals present at the bowling alley.  Approximately one hour after the doors were locked, the lone robber, a male individual whom Garner had never seen before, came into the bowling alley through the front door and asked all four to lie down near the control booth. Garner indicated that the robber gained initial entrance into the bowling alley by

---

[7] The state habeas court sustained the State's objections to the admission of both the transcripts of Garner's statements and a diagram of the victims' body positions at the time of the shootings penned by Garner, on the grounds that the transcripts and the diagram were not relevant since Garner was not called as a witness. In our view, the state habeas court's failure to admit these matters constituted plain and clear error.  Likewise, the state habeas court's failure to admit these materials leads us to conclude that, under § 2254(d)(2), "the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing" on the ineffective assistance claim.

15

convincing the night manager, Steven Sims, that he needed to fill a white plastic container with water for his car. Garner also indicated that Sims and the robber went outside together after the robber talked his way in and that when they came back in, the robber directed Sims to get the money out of the register and made all four of the victims lie down on the floor. After a minute or so, Garner stated that the robber just started shooting and he thought he was shot third.

### ii. Garner's July 18, 1980, Statement

At approximately 4:45 p.m. the next evening, Kardatzke returned with Detective Williamson and Officer Yarberra to speak with Garner in his hospital room. In this second interview, which was also taped and transcribed by the police, Garner's responses were more articulate, and he added the following information.

Garner had arrived at work at approximately 5:30 p.m. and worked until closing. He and Temple were going to stay through the night and Steve Sims was going to leave once he finished his paperwork after closing. Garner recounted how he moved his car across the street to the church so that it would look like no one was there. He stated that Sims locked the front door after closing, but unlocked the door sometime later to let the robber in.

When the robber first arrived, Garner was bowling on lanes 25 and 26. Garner gathered from the context of Sims's and the robber's actions and conversation that the robber needed to fill a

16

plastic container he was carrying with water for his car. Sims went out the front door with the robber and they returned a short time later. When the two men reentered the building, Garner walked up to see what was going on. He noticed then that the robber had a gun by his side. Garner stated that the robber took Sims over to the register to get the money out and that they were all made to lie down. Then, according to Garner, the robber just shot them, "boom, boom, boom." Garner stated that no one screamed or said anything and that the robber didn't strike anyone before shooting. He recalled talking on the phone to both his mother and the manager of the bowling alley whom he referred to as "the head guy."

Garner initially stated that the robber was a black man, but later corrected the detectives by stating "no, he was white." Garner also described the man as approximately 25-28 years old, with no hat or mask. He also described the robber as medium build. In addition to the statement given to the detectives on the 18th, Garner also identified the relative positions of the victims at the time of the shootings in a drawing made during this interview.[8] He depicted the victims' relative positions at the time of shooting, in a semi-circular configuration ordered as follows: Felsher, Sims, Garner, Temple.

---

[8] Garner's drawing is initialed by Williamson, who was present during the July 18th interview with Garner and who testified at the state habeas evidentiary hearing as to the authenticity of the drawing as being Garner's account of the body positions at the time of the shootings. See **"Appendix B,"** Garner's drawing attached to this opinion.

17

### iii.  Garner's July 19, 1980, Statement

On the evening of July 19th, Garner gave his third interview with Houston homicide detectives Novak and Magan, which was taped and transcribed by the police.  Garner reiterated most of the information previously given to the other detectives; that is, that Sims let the robber in after he knocked on the door, that the robber had a container for water for his car and that Sims and the robber exited and returned.

Garner added that when he first approached Sims and the robber, the robber asked him if he could open the register, to which he responded "I don't know how."  The robber then made him lie down on the floor.  The robber asked Sims if anyone else was there.  Temple and Felsher were called up to the front and the robber made them lie down on the floor, too.  The robber then stayed in front of the control counter with the gun on everybody and directed Sims to go empty the register and hand over the money.  After Sims did this, the robber made him come out from behind the control counter and lie down on the floor just outside of the swinging doors.  Garner told the officers that he lay down between Sims and Temple, with Felsher lying on the other side of Sims.  Garner stated that while on the floor, no one said anything to each other, no one screamed, and the robber didn't hit anyone.  Once Sims was back down on the floor, the robber just paused for a minute, said "good-bye," and shot everyone.

18

Garner recounted again how he got up after the robber left and called his parents, and he remembered the manager of the bowling alley calling him. He then stated that he went back over and lay down in a different position than where he had been shot. He recalled lying down next to Felsher because she was the only one still alive. Garner surmised that he passed out shortly thereafter. He regained consciousness when his father arrived at the scene.

### iv. Garner's July 20, 1980, Statement

Garner gave his fourth interview with Kardatzke and Detective Ladd ("Ladd") the evening of July 20th which was taped and transcribed by the police. He repeated the same general information he had given the three previous days but added that the robber was a little over 6 feet tall, had no facial hair, and had light brown hair pulled back. No additional information was provided at this interview.[9]

---

[9] We note here that, at the police investigators' request, Garner underwent hypnosis on August 21, 1980, and a report of that session confirmed the general information provided by Garner in his tape recorded interviews of July 17, 18, 19, and 20. Additional information regarding the taking of wallets and the robber's physical description was obtained from this interview. The following is taken from the written summary report of the hypnotic interview which was memorialized on the district attorney's letterhead and signed by Robert J. Bodisch and B.T. Neff.

The witness stated that he arrived at work at approximately 4:30 p.m. . . . [A]t approximately 9:30 p.m. the bowling alley manager called and asked him to spend the night at the bowling alley. The witness told the manager it would be O.K. if he could get another man to do it with him. The witness stated that he then moved

19

his car to the church across the street. He stated he moved his car so that nobody could see it. He stated that the manager also talked to Tommy about staying. The witness stated that at 11:30 p.m. they were getting ready to close, the customers had left, and at that time Tommy, Steve, Elaine [sic] and himself were the only persons left in the bowling alley. He stated that he was at the bowlers stand on lane 25-26 with Elaine [sic] and he noticed Steve letting a guy into the front door. The witness stated that he had never seen the guy before, he had dark hair, a little bit curly around the shoulders, parted down the middle, clean shaven face. He stated that he did not pay much attention to the guy because he thought Steve knew him. He stated that the guy went outside but came back in[;] at this time he finished bowling and was walking to the counter. He stated that Steve and the other person were next to the counter. The witness stated that as he walked up to the counter the guy asked him if he could get the money out of the register. He stated that the guy had a gun in his right hand. The witness stated that he told the guy he couldn't get the money out of the register. The guy then asked if he had his wallet and the witness replied no. The witness was then told to lay on the floor. The guy then asked Steve if anyone else was in the place and he replied yes. The witness further described the guy as 6 feet, 170 lbs., dark hair, skin was white, clean shaven, curly hair-shoulder length-pretty long, average build wearing a short sleeve shirt. The witness stated that Steve then went to the middle of the counter and called Tommy to come up to the front. Tommy and Elaine [sic] both arrived and laid down next to the witness. Steve and the guy then went to the register and got the money and then Steve laid down beside the others on the floor. The guy then again asked for this witnesses [sic] wallet and this time the witness took it out of his back- pocket and placed it in front of his head. The witness stated that the guy told them they only had 10 or 15 seconds left, and that the guy was nervous. The witness stated that the guy shot us. He stated he heard one maybe two shots before he was shot, and that he was not the last one to be shot. He stated, "I don't know why he shot, he didn't say anything." The witness stated that the man who shot him was the same man that came in the first time after they closed.

This hypnotic interview was conducted approximately two weeks after

20

### v. The Composite Drawing

In addition to the information Garner provided to the investigators about how the robbery occurred, he was also able to assist a police artist in developing a composite drawing of the lone perpetrator. Along with the composite drawing, on July 30, 1980, police released Garner's description of the perpetrator as a white man between 25 and 30 years of age, 6'-2", 160 to 185 pounds with brown to dark brown hair worn combed back in front and over the ears, but not touching the collar.[10] The composite drawing and Garner's description were widely publicized in the newspaper and on the local television news.[11]

It is apparent that despite the alleged "retrogressed amnesia," which the State suggested at Soffar's trial rendered Garner's memory unreliable, detectives relied on the credibility of Garner's statements and composite drawings obtained therefrom

___

Soffar was arrested and charged for capital murder of Felsher, and after Garner was unable to identify Soffar in a line-up.

[10] Garner assisted in the production of a second composite drawing of the same perpetrator on August 5, 1980, the day Soffar was initially arrested for theft of a motorcycle and first questioned regarding the bowling alley murders. Despite this, he was unable to identify Soffar in a line-up on the next day, August 6.

[11] Indeed, Soffar's sister, Jackie Carney, testified that at some point between July 14th and August 5th, and while in her car en route to her doctor, Soffar said "Jackie, you know that composite drawing that I seen on the news, . . . that looked kind of like Latt [Bloomfield], and that would be an easy way to get a $10,000 reward would be to say that Latt [Bloomfield] did it."

21

throughout their investigation. Police statements to the press included the investigators' firm belief that they were looking for one unknown white male "hi-jacker" matching the description Garner gave, who talked his way into the bowling alley by feigning car trouble. After initially receiving over 250 calls in regard to publication of the composite drawing, by August 4, 1980, the exhaustive police investigation of the bowling alley murders had few if any promising leads.

On August 5, 1980, at approximately 8:00 a.m., a League City, Texas, police officer, Raymond Willoughby, observed Soffar traveling approximately 57 miles per hour on a motorcycle in a 45 mile per hour speed zone on the westbound side of West 518 in League City, Texas.[12] Subsequent investigation disclosed that the motorcycle was stolen in Friendswood, Texas on August 4, and Soffar was arrested for motor theft and placed in jail.

## C. The Interrogation of Max Soffar and His First Three Written Statements

Over a period of three days following his arrest on the stolen motorcycle charge, while he was in custody and without counsel present, Soffar would sign three written statements, prepared by detectives, in which he implicated himself and Latt Bloomfield in the bowling alley robbery-murders.

After booking Soffar for the motorcycle charge, the League

---

[12] League City, Texas, is located in Galveston County, Texas, and lies approximately 23 miles southeast of downtown Houston, on the east side of Interstate 45.

City police contacted Detective Bruce Clawson of the Galveston County Sheriff's Organized Crime Unit, for whom Soffar had been an informant. Soffar also knew Clawson from spending time at the Friendswood Police Department and considered Clawson his friend. Because of this supposed friendship, Clawson was summoned to be a "friendly face" for Soffar and to "hold Soffar's hand," in an effort to convince him that "he should talk to the Houston detectives." It is clear, however, that although Soffar believed that they were friends, the feeling was not mutual. Discussing his relationship with Soffar, Clawson stated, "Max might have considered me a friend but I didn't consider him a friend ... my primary job as a police officer was to get Max to talk." After speaking with Soffar during the morning of August 5, Clawson succeeded in getting Soffar to speak with the Houston detectives.[13]

### i.   August 5, 1980--Soffar's First Statement[14]

After Clawson's efforts to get Soffar to continue talking were successful, Detective Schultz interrogated Soffar for an additional two hours.[15]   At 3:30 p.m. on August 5, 1980, Soffar signed a

---

[13] We note that because Clawson's conversations with Soffar were never tape recorded or transcribed, we do not know what was said to convince Soffar to talk.

[14] A more detailed description of the events involved in the taking of Soffar's statements can be found in Soffar I. See Soffar I, 237 F.3d at 425-32.

[15] Soffar was also questioned for approximately 20 minutes by Assistant District Attorney Terry Wilson, and only this brief interview was tape recorded that day. Neither a cassette tape nor a transcript of this brief interview with Wilson is contained in

written statement prepared by Detective Schultz. The statement was identified as State's Exhibit 108, and while not introduced into evidence by the State, it was used against Soffar during the guilt phase of his capital murder trial. In this first statement, Soffar stated the following. He and Bloomfield went to the bowling alley one night in the first part of July and Soffar entered through a side door and checked the cash drawer. Bloomfield asked him to return the next night with his pistol, but he told Bloomfield he was not going to do it. He did, however, later agree to drive Bloomfield to the bowling alley and wait outside. While he waited in the car outside the front door, he saw Bloomfield move some people around and he heard two shots when Bloomfield was out of his sight. He then saw Bloomfield make some people get on their knees. As he moved the car forward, he heard another shot and then two more shots. He stated that Bloomfield told him that someone pulled a gun on him. They then went to Galveston where Bloomfield robbed a U-Totem convenience store[16] and they bought some drugs.

After giving this first written statement, Soffar was transported to Houston police headquarters, where he spent an additional 3 hours with Houston police officers before he was transported to the jail at approximately 7:43 p.m.

**ii.  August 6, 1980--Soffar's Second Statement**

---

the record before us.

[16] There is no evidence confirming that this robbery occurred.

24

Beginning shortly after 9:00 a.m. the morning of August 6, 1980, Williamson mirandized and interrogated Soffar for approximately 50 minutes in a tape-recorded conversation during which Soffar relayed more details of the same basic scenario, i.e., that he drove to the bowling alley and that Bloomfield did the robbery and shootings alone.[17] At approximately 10:00 a.m., Soffar was taken to a line-up arranged for surviving witness Garner's viewing. Garner failed to positively identify Soffar.[18] Soffar was then mirandized and interrogated again by Williamson and Ladd, for approximately 1 hour and 15 minutes before giving his second statement.[19]

At 2:44 p.m. on August 6, 1980, Soffar signed the second written statement prepared by Ladd. This statement was identified as State's Exhibit 109. As with State's Exhibit 108, the second

---

[17] While neither a cassette tape or a transcript of this conversation is contained in our record, the record does reflect that during Williamson's interrogation, he drew a map for Soffar including significant details, and that the map was then adopted by Soffar.

[18] Garner was also unable to positively identify Bloomfield, who had been arrested and brought to Houston police headquarters and placed in a line-up. We pause here to note also that a search warrant executed on Bloomfield's residence and car yielded no evidence linking him to the bowling alley robbery-murders. Similarly, a search warrant executed on Soffar's residence failed to produce any evidence of Soffar's involvement.

[19] This conversation, like virtually all others with Soffar was neither tape recorded nor transcribed. Instead, the substance of these interrogation sessions was summarized by detectives and presented to Soffar in the form of written statements for his signature.

statement was not introduced into evidence by the State, but was used during the guilt phase of his capital murder trial.  In his second statement, Soffar told the same basic story as he had in his first statement, adding the following details.  The night before the robbery-murders, it was Soffar who kicked in the glass side door of the bowling alley to commit the burglary.[20]  The next day, Bloomfield picked him up at 1:00 p.m. and they hung out together for the afternoon.  That evening they drove back to the bowling alley at 9:00 p.m., but since there were a lot of people there, they just parked the car and drank beer until most everyone had left.  Again, Soffar stated that he pulled the car up in front of the doors while Bloomfield went inside of an unlocked front door. Bloomfield was approached by two people and then another, and he made these three lie down on the floor right in front of the door. Bloomfield motioned to someone else to come over and then Soffar heard the first shot.  He could see the feet of the people on the floor.   He  then  heard  another  and  then  several  other  shots. Bloomfield came running out of the bowling alley with the gun in one hand and the lady's stocking he had put over his face when he entered in the other hand.  Bloomfield told him that someone pulled a gun on him so he "did what he had to do."  Soffar added that they went to buy drugs that night from an individual named "Pops," and

---

[20] The police obviously knew this was not true because they had previously arrested the four youthful perpetrators of the burglary which Soffar now claimed that he and Bloomfield committed.

that several weeks after the robbery-murders Soffar told Pops about the "deal at the bowling alley." He asked Pops "if he heard about it and that Latt [Bloomfield] and I had done it."

At some point after signing his second statement at 2:44 p.m., Soffar was visited by, and he spoke privately with: his mother, Zelda Soffar; his uncle, Carl Lander; and his aunt, Celia Nathan.[21] Ms. Nathan informed Detective Ladd that the family was in agreement that Max should cooperate with the police. At approximately 4:00 p.m., Detectives Williamson and Ladd checked Soffar out of the jail and took him in a patrol car to the crime scene. They pulled into the parking lot, but did not go inside of the bowling alley. At approximately 5:30 p.m., the detectives drove Soffar to an area south of Houston where he identified Lawrence Bryant, a.k.a. "Pops," as the person from whom he and Bloomfield had allegedly purchased drugs the night of the robbery-murders. At approximately 7:30 p.m., the detectives then took Soffar to Galveston where Soffar pointed out a convenience store Bloomfield had allegedly robbed. Soffar was checked back into the jail at 10:55 p.m.[22]

During the time Soffar was riding around with Detectives

_____

[21] Celia Nathan was also an attorney who had represented the Soffar when they had Max Soffar committed to a Texas state mental hospital in Max's pre-teen years.

[22] In a letter written to one of Soffar's appointed defense counsel, Joe Cannon, which is discussed infra at Part I.E.iii. Soffar alleged that during this drive around town, the detectives became forceful with him and told him that Garner had picked him out of the line-up, so he "might as well say [he] did it and get a life sentence."

27

Williamson and Ladd, the police released Bloomfield from custody, citing a lack of any corroborating evidence to justify charging him in the robbery-murders.

### iii.  August 7, 1980--Soffar's Third Statement

Beginning at approximately 8:42 a.m. the morning of August 7, 1980, Detectives Tom Ladd[23] and Ted Thomas interrogated Soffar for approximately two and one-half hours.  Soffar was also briefly interrogated that morning by Williamson.  That afternoon, a felony capital murder complaint was filed against Soffar alleging that he intentionally caused the death of Felsher while in the course of committing or attempting to commit the armed robbery of Sims.

Upset because he had learned that Bloomfield had been released and because he thought that he was going to be charged with all three murders alone, Soffar contacted a family member and asked them to have detectives come and see him at the jail.  At approximately 7:30 p.m. that evening, Detectives Ladd and Williamson came to see Soffar again.  Soffar inquired as to why Bloomfield had been released and the detectives responded that they did not yet have enough evidence on Bloomfield to either hold or charge him.  Ladd then began actively interrogating Soffar for another 30 minutes before beginning to take and prepare Soffar's third statement.

At 9:25 p.m. on August 7, 1980, Soffar signed the third

---

[23] Detective Tom Ladd is the brother of Detective J.W. Ladd ("Ladd").

written statement prepared by Ladd.  This statement, identified as State's Exhibit 110, was introduced into evidence by the State, and used against Soffar during the guilt and penalty phases of his capital murder trial.  The entire text of Soffar's third statement reads as follows:[24]

> My name is Max Soffar.  I have been in jail since Tuesday morning for this bowling alley deal.  I gave two previous statements, one to detective Schultz and one to detective Ladd. I didn't tell the whole truth in those statements and want to now so that I don't take this whole thing by myself.
>
> One thing that I didn't tell the truth on was that Lat Bloomfield and I did this thing when we first got to the bowling alley, not like I said about being there in the parking lot for awhile.  Lat drove in and we were in his brown thunderbird.  Lat pulled right to the front door so that the passenger side was next to the bowling alley.  I think that there was a couple of cars in the parking lot when Lat pulled to the door.  Lat pulled a stocking over his hair so that his hair would be pulled back.  I pulled up my t-shirt over my nose and mouth. Lat had his 357 revolver which I think is an R-G model. This gun had about a three inch barrel.  He had the gun under his shirt when we walked in a guy asked what we were doing.  Lat pulled the revolver and stuck it in this guys face and said, "This is a robbery."  Lat pulled this guy by the hair and made him get down on his knees and xx walked up.  This was two dudes and a girl.  Lat told them to get on the floor and if they didn't do what he told them that he would shoot this first guy who was already on the floor.  They got down on their knees away from the counter and Lat made them come back closer to the control counter and they did.  They were laying from the door so that there was a dude and then a girl and then another dude and then the last dude.  The second dude was trying to look up and Lat told him not to be looking and to turn around and lay facing the way all the others were.  He then turned around so that they were all facing back towards the snack bar.  The second dude kept looking around so Lat fired a warning shot into the floor.  The

---

[24] This statement is reproduced exactly as prepared.  All scrivener's errors and omissions are contained in the original.

girl screamed and then Lat told her to shut up and she kept screaming. Lat kicked the girl in the back and then the second dude who was the one who kept looking up started to raise up. He was about half way up when Lat shot him in the back of the head. Then Lat just turned around and shot the third dude. This third dude was the first one Lat grabbed and made get on the floor. He shot him the same way as the first one that he shot. Lat threw me the gun and told me to shoot the other two. I hesitated and then he said, "Shoot them now." I aimed the gun and the other guy who was still left who was closest to the door and fired one time. I hit him in the back of the head behind the ear. I walked around the other side of them and heasitated [sic] and Lat said, "Shoot her." She had her face down and she just looked up at me and I aimed and turned my head and shot her. I think I hit her in the cheek. I had the gun and ran around and looked in the cash register over by where you get the shoes. I got all the bills and a little of the change and then went to the office but the door was locked. I went over to the cash register by the snack bar and took bills out of it too. I put the money in my pockets. I went back by the office and tried to force the door open but I couldn't get it opened. Lat was looking under the counter for a money bag and I think he got 50 or 60 dollars. We walked over by the office and I told him I thought I saw some headlights. I went outside but I didn't see anyone so when I came back in Lat was rumageing [sic] through their pockets and took the wallets out of their pockets. He took the money and I think that he kept the wallets. We looked around to make sure that nobody was looking and we didn't see anybody. I asked him if he wanted to check in the back and he said no. So, we looked in the bathrooms making sure no body was in there. Then we left. I still had the gun. Lat drove and we had the windows down to his car. He made a right on the highway and drove down for a little bit and then turned around and came back past the bowling alley. I asked him why he shot the dudes and he said he shot the dude for raising up and playing hero. He said he made me shoot the other two so that I would be as guilty as him if we got caught. I put the gun under the front seat after I reloaded it and it only had one live bullet in it before reloading. I don't know where the gun is now. The last time I saw the gun was I believe last Saturday night and Lat had it at that time. We went to score some pills and got 24 pills over at the dope house. These were preludins. After the gas and pills I got 95 dollars out of the deal and I think Lat

30

got a lot more. We went to my house and did some preludin and Lat said he was afraid someone had seen his car so he went and took it home. He walked back over to my house that night and we did the rest of the pills. We stayed up all day and went out to the park the next day. I was scared and that is the reason that I did not tell the whole truth before and I feel like shit and feel bad about what happened and ought to take my punishment for it. I think Lat and me both ought to pay for what we did.[25]

In addition to his written statement, Soffar drew a diagram of the positions of the victims at the time of the shootings. In the diagram, Soffar depicted the four victims lying parallel to one another with their feet aligned along the edge of the control booth. This diagram was not introduced into evidence during Soffar's capital murder trial, but was admitted into evidence by the state habeas court. It is attached to this opinion as **"Appendix C"**.[26]

## D. Inconsistencies Between Garner's and Soffar's Accounts

As a factual matter we pause here briefly to note that when juxtaposed, Garner's and Soffar's accounts of the robbery-murders appear dramatically at odds with one another. The numerous fundamental factual inconsistencies between these two versions of

---

[25] We note, as did the Texas Court of Criminal Appeals, that neither this third statement nor either of the two previous statements, set out "the date, county, city, state, nation, street address or name of the bowling alley, the name of any victim, or any other fact which might expressly reflect that appellant's statement relates to the offense for which he was tried, convicted, and given the death sentence." Soffar v. State, 742 S.W.2d at 375.

[26] The witness signatures at the bottom left side of the diagram belong to Detectives Cain and Kardatzke.

events are both obvious and striking. The most noteworthy discrepancies between Garner's recollection during interviews by detectives and Soffar's third written statement are summarized in table format in **"Appendix A"** to this opinion. This appendix is followed by Garner's diagram of the victims' positions at the time of the shootings (see **"Appendix B"**), which also differs dramatically from Soffar's diagram of the victims' positions at the time of the shootings (see **"Appendix C"**).

According to Garner's diagram, the victims at the time of the shooting were in a semi-circular position with Garner located between Sims and Temple. Thus, the order of the victims was Felsher, Sims, Garner, and Temple, or female, male, male, male. In contrast, Soffar's diagram shows the victims at the time of the shooting in a straight line in the following order: male, female, male, male. Although Soffar's diagram is consistent with the scene when the victims were found, it is significantly inconsistent with Garner's version of where the victims were located when the shooting took place. Further, in his statements, Garner explained why the order of the victims changed from the time of the shooting to the time the police arrived, telling the police that after he used the phone, he laid down in a different location next to Felsher, who was the only other victim still alive at the time.

We also note that the physical evidence in this case supports Garner's account of events more than Soffar's third statement.

32

With respect to the forensic and ballistics evidence, as discussed supra, the bullet holes found in the carpeting of the bowling alley are consistent with the body configuration recalled by Garner, that is, with him lying between Sims and Temple when he was shot. There is no physical evidence to support Soffar's account of Garner having been shot lying between the front door and Felsher. In fact, the only unmatched bullet hole, which could represent the final resting point of the bullet exiting just beneath Garner's left eye, is the one between Sims and Temple. Also with respect to body configuration, the photographs of the crime scene depict the bodies aligned, not parallel to one another along the edge of the counter as depicted in Soffar's account, see **"Appendix C"**, but in a semi-circular configuration nearly identical to that depicted by Garner in his diagram, see **"Appendix B"**. Indeed, the photographs show a large vacant space between the bodies of Sims and Temple where, according to Garner, he would have been lying when shot.

With respect to Garner's account of how the perpetrator gained access to the bowling alley by feigning car trouble, a passerby to the bowling alley, who was never called as a witness by the State, told the police that at approximately 11:50 p.m., he passed the bowling alley and slowed down because he was looking for a place to purchase cigarettes, and that he saw a car parked directly in front of the bowling alley with its hood up. This individual saw just one person walking from that car toward the front entrance of the

33

bowling alley.  Additionally, one of the police photographs of the crime scene showed that there was a white plastic water jug like the one described by Garner as belonging to the robber located on the control booth counter.[27]

## E.  Appointment of Counsel and Pre-trial Developments

On August 8, 1980, the day after Soffar gave his third written statement, Soffar made his preliminary initial appearance on the felony capital murder charge before the 232nd Judicial District Court of Harris County, Texas.  During this appearance, the state court appointed Frederick Stover and Joseph Cannon to represent Soffar because of his indigence.  These attorneys, who were present in the courtroom to accept their appointment, were advised that their client had already signed three written statements implicating himself in the charged offense.

### i.  Soffar's Letter to Counsel

At some point after first meeting with Cannon, Soffar wrote a letter to Cannon explaining his side of the story.  In a handwritten letter, Soffar wrote:[28]

> This whole thing started when, this detective in Friendswood said he was going to lock me up cause I was

---

[27] The police overlooked the water jug and did not dust it for fingerprints.  The next morning, the bowling alley cleaning crew recalled seeing it, but removed it and washed it because they thought it was used by investigators to clean up fingerprinting dust.

[28] This letter is reproduced exactly as penned by Soffar.  All scrivener's errors and omissions are contained in the original.

a habitual criminal.  His name is Mr. Palmary.  He's busted me a few times and he does not like me.  He told me next time I bust you for something bad I'm going to put you away for the rest of your life.  Well anyway, he busted me the last time for false imprisonment.  Me and a girl had an argument and she wanted to leave and I wouldn't let her.  So someone called the police and he talked her or rather he therened her.  She had a 38 snub nose pistol in her pocket when we were arrested, so he told her if she didn't file some charges on me for kidnapping or false imprisonment, that he would file on her for a concealed wepon.  Then he comes in and says I got you now boy.  So when I got arrested on that stolen bike I look up and who drives up, Mr. Palmary, and he's standing there with them lueague City police saying, I've got you now punk.  So we go to lueague City Jail and I started thinking well Ill fix you smart ass and I told them I wanted to talk to bruce Clawson about the bowling alley.  I knew it would be hell on me if I said anything but at that point I didn't care.

I was already on a years probation out of galveston co. and I'm caught on stolen bike.  By the way that bike had the licence plate on it from another bike I had stolen. plus I had been on bond from an auto theft charge from Brazoria County.  plus I am holding pot and some stolen jewels.  So I told them that so palmary couldn't put his slimy hands on me.  I told my sister when I saw that drawing of the killer, I told her it looked like latt. he stole some silver from my house so I was going to tell the police he did it and get the reward, and get evan. She told me not to do it so I didn't.  Then when I got pulled over and I see palmary standing their I decided to say I knew who did it.  Next thing I know them homicide detectives had me saying I did it. the truth is I did not kill anyone.  There is a lot more to this than I can write.  I will tell you the whole thing when I see you so you can check out my side of this to be sure yourself. Them police had me say what they wanted to hear.  Did you know I took a polygraph test?  I was on acid when I took it.

The night before the robbery, their was a burgurly at this bowling alley.  I told the police the night before the robbery, I broke into the bowling alley. That was what I saw on the t.v. so I said in a statement, me and lat bloomfeild did the burgurly.  When I told them I killed some girl, which was another lie, they asked me if I really broke in the night before.  I said no.  They

asked me that quiestion about <u>100</u> times. I put in a statement that I did. But after they kept asking me that same question over and over I said no, just to see what he would say. I did not put in a statement that I didn't brake in the bowling alley. I said I did. Then he told me I didn't do the burgurly cause they arrested some kids for it. If I really did this why didn't I say I didn't brake in. Cause that was what I saw on the news. I thought the brake in was done by the same person or persons that did the robbery.

Me and 2 homicide police went out looking at bowling alleys. They wanted me to point out the bowling alley we robbed. They <u>were drinking</u>. We stopped 3 or 4 times for cokes for their mixed drinks! I asked them for some for my nerves and they said no. But they were drinking and that's when they started getting forceful. I made 2 more statements later that day. I <u>will</u> take a polygraph test to prove I'm not lying about the drinking or the force they used. They also told me that greg gardner picked me out so I might as well say I did it and get a life seentence. They also asked me why lat shot the girl in the face before I made the last 2 statements. I said in one of the statements that I did it. In the 3rd statement after they gave me a few details, I said I shot her, to get them off my back. I went thru more quiestions than I thought I would. After I went back to my cell after I gave the second statement I was so tired I just gave in to them.

The officers that were drinking was detective ladd and detective Williamson. They took me to galveston and to lamarge, to check out some robberys that I told them me and lat did. They all turned out to be lies. I admit that I <u>did </u>rape that girl in Alvin I told them I did. I told the Galveston County Sheriff I stole 2 motorcycles and I <u>did</u>. But I told them I shot the girl in this case. It's a <u>lie</u>. I knew I was in lots of trouble anyway, for all the other things I have done, that's why Im in the trouble Im in now.

### ii. Garner's Final Interview

On August 21, 1980, after all of Soffar's confessions had been taken and the State had been enjoined from interacting with Soffar any further, the State submitted Garner to questioning under

hypnosis. Presumably, the hypnotic interview was conducted in an effort to bolster the strength of the State's case against Soffar. However, Soffar's appointed counsel were not invited and did not attend this session with Garner; and in the end, Garner's account of events under hypnosis only served to confirm the version of events he had described in his initial interviews with investigators, and that version of events differed dramatically from the version given by Soffar in his written statements. See **"Appendix A"**. If Garner had testified at trial in a manner consistent with the statements made to investigators on July 17, 18, 19, 20, and August 21, 1980, such testimony would have seriously undermined the State's case against Soffar.

The State did not call Garner as a witness at Soffar's trial. Indeed, at trial, instead of calling Garner, the State called Dr. Gildonburg, the neurosurgeon who operated on Garner, during its case-in-chief. Dr. Gildonburg testified that Garner could be suffering from retrogressed amnesia and that Garner could have created a false memory of events. Dr. Gildonburg did not express any medical opinion that Garner was in fact suffering from amnesia. Additionally, we note that Soffar's defense counsel were informed that Garner was a "vegetable" with no memory of the offense, and incredibly, based upon this assertion and the fact that Garner was not going to be called by the State as a witness, Soffar's defense counsel did not even attempt to interview Garner themselves.

37

Rather amazingly, defense counsel instead chose to bolster Dr. Gildonburg's testimony by asking and receiving an affirmative response to the question, "would it be a fair statement . . . that a person that suffered the type of wounds that Greg Garner suffered, no one, including Greg Garner, himself, would ever know whether he was giving an accurate account of the events that caused his injury?," thus implying to the jury that, indeed, Garner had no useful memory of the offense.

## F.  The Trial

Beginning on March 16, 1981, Judge Van Stovall presided over Soffar's capital murder trial which, exclusive of nearly four weeks of voir dire and jury selection, lasted two and a half weeks.

During the trial, and pursuant to Jackson v. Denno, 378 U.S. 368 (1964), Judge Stovall conducted a two-day hearing out of the jury's presence on the admissibility of Soffar's first three written statements.  During the Jackson v. Denno hearing, Sergeant Bruce Clawson testified that Soffar neither asked for an attorney, nor had any questions about his rights.  At the conclusion of the admissibility hearing, Judge Stovall entered an oral ruling that the three statements were freely and voluntarily made after appropriate Miranda warnings.  A written order to the same effect was entered on May 22, 1981.  In his rulings, Judge Stovall held that each of Soffar's first three written statements was signed after Soffar "knowingly, intelligently and voluntarily waived the

38

Statutory and Constitutional rights."

Clawson and the other witnesses who testified at the *Jackson v. Denno* hearing, repeated the essence of their testimony before the jury. The State offered the testimony of Lawrence "Pops" Bryant to corroborate Soffar's confession. Bryant testified that several weeks after the bowling alley robbery-murders, Soffar asked him if he had heard about the bowling alley murders and then stated to him "if I told you who did it you wouldn't believe me." During this conversation, Soffar told Bryant that three people got shot. Bryant testified that Soffar indicated to him that he and Bloomfield were involved in the bowling alley robbery. Mabel Cass, Bryant's girlfriend testified that she did not participate in, but witnessed the conversation between Bryant and Soffar, and confirmed in substance that Soffar talked to Bryant about the bowling alley robbery-murders.

Defense counsel presented Soffar's case based on an alibi theory. Soffar's mother, Zelda Soffar and other witnesses confirmed that Soffar spent the entire weekend of July 12-13, 1980 helping a family member move. Martin and Donna Naylor testified that they dropped Soffar off at his mother's house in Friendswood sometime after 7:00 p.m. on the evening of July 13, 1980. According to the Naylors, all of the men who were moving the family belongings, including Soffar, were exhausted from working all day, for two days straight in the summer heat. Mrs. Soffar testified

39

that Max was exhausted when he was dropped off and that he watched a little bit of television and then went straight to bed. She testified that he was in the house when she awoke the next morning, July 14, 1980.[29]

On March 31, 1981, the jury returned a verdict of "guilty of the offense of capital murder." Judge Stovall then presided over the penalty phase of Soffar's trial, which lasted three days. The State called numerous witnesses to attest to Soffar's criminal history and reputation for having a violent temper. Amazingly, Soffar's defense counsel presented no testimony or mitigating evidence of any kind whatsoever during the penalty phase.

The three special issues submitted to the jury pursuant to the applicable version of Article 37.071(b) of the Texas Criminal Code were as follows:

> A.   Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?
>
> B.   Do you find from the evidence beyond a reasonable doubt that there is a probability the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?
>
> C.   Do you find from the evidence beyond a reasonable

---

[29] Mrs. Soffar, who had a substantial hearing problem also testified that, though she did not hear Max or anyone else come or go that evening, and though the family dog never barked as it normally did when people came to the house, Max's bedroom had its own exterior door. Prosecutor Tobias suggested during her cross-examination that it was possible that Soffar left, committed the bowling alley robbery-murders, and returned before she awoke.

doubt whether the conduct of the Defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased?

TEX. CRIM. PROC. CODE ANN. § 37.071(e) (Vernon 1981).

On April 3, 1981, the jury returned its verdict answering each of the three special issues in the affirmative. Consequently, as required by Texas law when the jury so answered, the trial court entered an order sentencing Soffar to death by lethal injection. *Id.*

## G.  Post-Conviction Proceedings

Soffar's conviction and sentence were automatically appealed to the Texas Court of Criminal Appeals which, on September 23, 1987, affirmed Soffar's conviction and sentence in a written opinion. See Soffar v. State, 742 S.W.2d 371 (Tex. Ct. Crim. App. 1987) (en banc). Soffar's conviction became "final" for purposes of this appeal when the United States Supreme Court denied Soffar's petition for writ of certiorari on October 10, 1989. See Soffar v. State, 493 U.S. 900 (1989).

On December 14, 1992, Soffar filed a state application for writ of habeas corpus in the 232nd District Court of Harris County, Texas, alleging twenty-four grounds for relief. Judge A.D. Azios[30] conducted a thirteen-day evidentiary hearing during the time period between August 16, 1994 and September 8, 1994. On November 10,

_____

[30] Judge Azios was not the same judge who tried the case originally. Judge Van Stovall, who was a visiting judge, presided over Soffar's original trial.

41

1995, Judge Azios entered written findings of fact and conclusions of law recommending denial of Soffar's application. On April 8, 1996, the Texas Court of Criminal Appeals, in a two-paragraph, unpublished per curiam opinion, followed Judge Azios's recommendation and denied Soffar's application for habeas corpus relief.

On April 22, 1996, Soffar filed his first federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Texas alleging twenty-four claims for relief. Soffar filed a motion for partial summary judgment in the district court, and the Director filed a motion for summary judgment on all of Soffar's claims. <u>The Director did not contest that Soffar had sufficiently exhausted his available state remedies, except with respect to claim 24,[31] as to which the Director waived exhaustion, and with respect to a portion of Soffar's *Brady*[32] claims, which were premised upon the State's alleged suppression of a ballistics report and the pretrial statements of Garner</u>. The district court assumed that Soffar had properly exhausted his state court remedies with respect to the *Brady* claims, and denied Soffar's *Brady* claims on the merits. The

---

[31] Claim 24 concerned the argument that execution of a death sentence after a period of more than 15 year since the sentence was imposed is cruel and unusual punishment. <u>See</u> <u>Lackey v. Johnson</u>, 83 F.3d 116 (5th Cir. 1996).

[32] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

42

district court refused to grant Soffar's motion for discovery and an evidentiary hearing,[33] and entered a written order granting the Director's motion for summary judgment on all claims.

Soffar filed his notice of appeal from the decision of the district court in this case on April 24, 1998, and he filed his motion requesting issuance of a certificate of probable cause to appeal with this Court on September 3, 1998, which covered among other claims the following issues:

(1) Whether the State violated Soffar's Fifth Amendment privilege against compelled self-incrimination by interrogating him after he had invoked his right to counsel, and further, that the State obtained an invalid waiver of his rights by virtue of untrue and deceptive responses made by a detective to Soffar's questions about obtaining counsel, which rendered his subsequent custodial statements involuntary;

(2) Whether the extraneous offense evidence used against Soffar in the penalty phase, that is, Soffar's August 19, 1980, written statement as to the rape of Caroline Knight, was tainted by a violation of Soffar's Sixth Amendment rights because the State interrogated Soffar after he had requested and been appointed counsel;

(3) Whether Soffar was denied the effective assistance of

---

[33] The district court specifically found "that the Record was sufficient for determination of the pending motions," and denied Soffar's motions to augment the record.

counsel by virtue of his defense counsel's failure to investigate, develop, and present available evidence during the guilt phase of Soffar's trial; specifically, the failure to retain a ballistics expert or develop ballistics evidence, and the failure to investigate, develop, or present evidence with respect to Garner's statements to police.

On December 21, 2000, the panel issued its opinion in Soffar I which granted a COA on the merits as to each of the issues described above. Having determined that Soffar was entitled to full relief from his conviction and sentence based on the merits of his Fifth Amendment challenge, the panel majority reversed the order of the district court granting summary judgment in favor of the Director, and remanded the case to the district court for entry of an order granting Soffar's application for writ of habeas corpus, setting aside Soffar's conviction and sentence for capital murder, and ordering Soffar's release unless the State commences a re-trial of Soffar within 120 days. Soffar I, 237 F.3d at 461. The panel did not address the merits of the remaining two issues.

On January 11, 2001, the Director petitioned for rehearing *en banc,* in which the Director raised for *en banc* reconsideration the correctness of the panel's determination of the merits of the Fifth Amendment/Miranda issues and the panel's grant of COA on the merits as to the two other issues. *En banc* reconsideration was granted on May 31, 2001, thereby vacating the panel opinion. The *en banc*

Court, in an opinion (<u>Soffar II</u>) issued on July 29, 2002, and authored by Judge Emilio Garza, affirmed the district court's denial of Soffar's Fifth Amendment claims raised in his habeas petition. However, the *en banc* Court reinstated the panel's rulings granting or denying COA on the merits as to each of the other claims raised by Soffar. The *en banc* Court, therefore, remanded the case to the panel for consideration on the merits of the outstanding two issues for which COA was granted. <u>Soffar</u>, 300 F.3d at 598.[34]

## II. STANDARD OF REVIEW

Because this is Soffar's first federal habeas corpus petition, which was filed pursuant to 28 U.S.C. § 2254 on April 22, 1996, two days prior to the effective date of AEDPA, we are bound by the Supreme Court's decision in <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997), to apply the substantive provisions of § 2254 as they existed prior to the changes made by AEDPA. Under the pre-AEDPA provisions of § 2254(d), which govern our substantive review of the merits of Soffar's petition, when considering a petition for writ of habeas corpus, we presume the factual determinations of the state court

---

[34] The conclusionary disposition of the *en banc* majority opinion stated:

> "We also REINSTATE the panel's rulings granting or denying a COA as to each claim raised by Soffar. We REMAND to the panel for consideration on the merits of the outstanding issues for which a COA has been granted. <u>See</u> footnote 1."

45

made after a hearing to be correct unless one or more of the following exceptions to such a presumption of correctness applies:

> (1) that the merits of the factual dispute were not resolved in the State court hearing;
>
> (2) that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing;
>
> (3) that the material facts were not adequately developed at the State court hearing;
>
> (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
>
> (5) that the applicant was an indigent and the State court, in deprivation his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
>
> (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding;
>
> (7) that the applicant was otherwise denied due process of law in the State court proceeding;
>
> (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such a factual determination, is produced as provided for hereinafter, and the Federal court on consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record[.]

See 28 U.S.C. § 2254(d) (1994). Notwithstanding this deferential scheme for state court factual determinations, we review the federal district court's factual findings for clear error, and we review issues of law de novo. See Crane v. Johnson, 178 F.3d 309, 312 (5th Cir.), cert. denied, 528 U.S. 947 (1999).

### III. DISCUSSION

46

We now address whether Soffar was denied the effective assistance of counsel by virtue of his defense counsel's failure to investigate, develop, and present available evidence during the guilt phase of Soffar's trial. Specifically, we must consider whether Soffar's defense counsel's failure to retain a ballistics expert or develop ballistics evidence, and the failure to investigate, develop, or present evidence with respect to Garner's statements to police amounted to ineffective assistance of counsel.

As a preliminary matter, we must first consider the State's argument (substantially adopted by Judge Garza in his dissent here in Soffar III) that "Soffar did not allege, either in state courts or in the court below, that his trial attorneys rendered ineffective assistance of counsel by failing to investigate and develop evidence regarding Greg Garner's statements to police or by failing to obtain a ballistics expert or other ballistics evidence." The State, therefore, now argues that those claims were not exhausted because they were never fairly presented to the state courts. In turn, the State concludes that Soffar's ineffective assistance of counsel claim should not be considered by this Court.

In his dissent in Soffar I, Judge Garza sets forth his disagreements with the panel majority as to the merits of Soffar's Fifth Amendment/Miranda challenge; but he raised no objections of any kind as to the grant of COA on the merits as to any of the three issues. We start with the premise, therefore, that the grant of COA on the merits as to all three issues was unanimous by the

47

panel. On *en banc* reconsideration, the *en banc* Court, in an opinion authored by Judge Garza, addressed and reversed the panel majority decision on the merits of Soffar's Fifth Amendment/<u>Miranda</u> issue, but it did not decide anything as to the correctness of the panel's grant of COA as to the other two issues, though the State raised such issues in its petition for *en banc* reconsideration. To the contrary, the *en banc* Court "reinstated" the panel's grant of COA on the merits as to all issues. Likewise, the *en banc* Court remanded the case to the panel for consideration on the <u>merits</u> of these two issues. (<u>see</u> note 34, <u>supra</u>)

After briefs were filed and oral argument was held in the current appeal and during the time that the opinions here in <u>Soffar III</u> were being drafted, the Supreme Court issued its decision in <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003), on February 25, 2003. In <u>Miller-El</u>, the U.S. Supreme Court reversed and remanded the decisions of another panel of this Court which had denied a certificate of appealability on all of the four issues which petitioner had sought from the United States District Court, Northern District of Texas. After commenting that our Circuit had applied "too demanding a standard on more than one level" the Supreme Court in <u>Miller-El</u> issued the following instructions:

> At the COA stage, however, a court need not make a definitive inquiry into this matter. As we have said, a COA determination is a separate proceeding, one distinct from the underlying merits. <u>Slack</u>, 529 U.S. at 481, 120 Supreme Court 1595; <u>Hohn</u>, 524 U.S. at 241,

48

> 118 Supreme Court 1969. The Court of Appeals should have inquired whether a "substantial showing of the denial of a constitutional right," had been proved. Deciding the substance of an appeal in what should only be a threshold inquiry undermines the concept of a COA. The question is the debatability of the underlining constitutional claim, not the resolution of that debate.

Miller-El, 537 U.S. at 342.

In our view the grant of COA by the original panel decision in Soffar I to consider the merits of the two claims before us here, which has been reinstated by the opinion of the *en banc* Court in Soffar II, clearly complies with the test of "debatability of the underlying constitutional claims" as instructed by the Supreme Court in Miller-El.

In his dissent here in Soffar III, Judge Garza obviously decides to change his mind in part about our prior grant of COA's on the merits of these two issues and now contends that the ineffective assistance of counsel issue is not properly before us procedurally, thereby avoiding the mandate of our *en banc* Court to address the merits of that issue, for which COA was granted. Out of an abundance of caution, however, we address the State's (and now Judge Garza's) contentions with the following analysis which is what was relied upon by the panel in Soffar I to grant COA on this issue, though not expressly articulated therein.

## A. Whether Soffar's Ineffective Assistance of Counsel Claim has been Exhausted in the State Courts.

Applicants seeking federal habeas relief under § 2254 must

exhaust all claims in state court prior to requesting federal collateral relief. The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court. See Duncan v. Henry, 513 U.S. 364, 366 (1995); Fisher v. State of Texas, 169 F.3d 295, 302 (5th Cir. 1999). This requirement provides state courts with a "'fair opportunity' to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim." Anderson v. Harless, 459 U.S. 4, 6 (1982). A claim is "fairly presented" to the state courts if there has been, for example, (1) reliance on pertinent federal cases employing relevant constitutional analysis, see Gartrell v. Lynaugh, 833 F.2d 527, 529 (5th Cir. 1987); Williams v. Lord, 996 F.2d 1481, 1483 (2d Cir. 1993); (2) assertion of the claim in terms sufficiently particular as to "call to mind" a specific right protected by the Constitution, see Evans v. Court of Common Pleas, 959 F.2d 1227, 1231-33 (3d Cir. 1992); or (3) allegations of a pattern of facts that is well within the mainstream of constitutional litigation, see United States v. ex rel. Sullivan v. Fairman, 731 F.2d 450, 454 n.8 (7th Cir. 1984).

**State habeas proceeding**

We find that Soffar's ineffective assistance of counsel claim now before this Court was "fairly presented" to the state courts and, therefore, that the exhaustion requirement has been fulfilled

50

for the following reasons.[35] During the state habeas proceeding, Soffar's counsel examined Officer Williamson, who along with Detective Kardenski, conducted an interview with Garner on July 18, 1980. Soffar's counsel moved to admit the transcript of this interview with Garner into evidence. The State objected to its admissibility based on relevance. The following dialogue then occurred between the state habeas court and Soffar's counsel:

> THE COURT: Transcript of a[n] interview in which Detective Williamson and Kardenski—what's the relevancy of Mr. Gardner's [sic] statement?
>
> MR. SCHROPP: Relevancy is Mr. Gardner was the sole surviving victim at the bowling alley, gave statements to the police that were inconsistent with the confession produced, taken from Max Soffar.
>
> THE COURT: So just 'cause they're inconsistent you want me to admit it or what?
>
> MR. SCHROPP: Yes sir the main reason we want them admitted has to do with what we previously urged the Court is that this is material that was available through the State file through the police file and the offense report material that was all available to the defense

---

[35] We note that on March 8, 1994, the state habeas court signed an order, which was drafted by the State's attorneys. The State contends the order limited the hearing to the specific allegations contained in the application, which according to the State, did not include allegations regarding Soffar's claims concerning Garner's statements and the ballistics evidence in question. Specifically, on this issue, the order limited the hearing to: "Ineffective assistance of counsel for failure to investigate, develop and present evidence and argument at the guilty [sic] phase supporting [defense counsel's] chosen theory of defense and undermining the reliability of [Mr. Soffar's] written statements to police." Our review of the order's language leads us to only one conclusion. We find that the order pertaining to Soffar's ineffective assistance of counsel claim was defined in terms of broad issues. The order did not exclude Soffar's claims regarding Garner's statements to police or the ballistics evidence.

counsel at the time that they were working on the case
Your Honor.

Statement of Facts, Sept. 6, 1994, at 80-81. The State then argued that admitting Garner's statements during the examination of Officer Williams was "not the proper way to admit them with regards to ineffective [assistance] of counsel." The court then ruled that Garner's statements were not relevant and refused to admit them into evidence.

There is no doubt that Soffar "fairly presented" his ineffective assistance of counsel claim concerning his defense counsel's failure to investigate the discrepancies between Soffar's statements and Garner's statements made to the police. "For a claim to have been 'fairly presented' to a state court to fulfill the exhaustion requirement, the applicant 'need not spell out each syllable of the claim before the state court.'" Fisher, 169 F.3d at 303 (quoting Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998)). The state habeas court, however, chose not to take the opportunity to apply controlling legal principles to the relevant facts bearing upon Soffar's constitutional claim. Rather, it chose to rule that this evidence, perhaps the most compelling evidence that Soffar had, was not relevant and was inadmissible.

Moreover, in his proposed findings of fact and conclusions of law presented to the state habeas court, Soffar consistently recited facts and allegations that give rise to the constitutional claims under Strickland, which are now before this Court. Soffar

did so even though it might have appeared futile to continue pursuing the issue in the face of the state habeas court's ruling that Garner's statements were not relevant and, therefore, were inadmissible.  For example, Soffar asserted:

> In light of his prior statements to the police, and his failure to identify [Soffar] at a line-up, Garner's testimony would not have supported the case presented by the prosecutors based on the Statement and, indeed, would have contradicted it in the key respects noted above, including the absence of any "warning shots"/"fifth bullet."  The prosecutor falsely told defense counsel that Garner was, at the time, a "vegetable," and defense counsel accepted this information, making no attempt to even contact Garner prior to trial. Joe Cannon Testimony at 136 (8/23).  Defense counsel also took no steps to develop evidence regarding the substance of Garner's statements, which could have been done, even in Garner's absence, by questioning the investigating police officers who took Garner's statements regarding the contents of their offense reports, particularly in light of the prosecutor's claim of Garner's unavailability as a witness.  There is nothing to indicate that defense counsel ever became aware that the physical, ballistics-related evidence consists of <u>four</u> bullets and 15 fragments and is consistent with the firing of <u>four</u> shots, not five, in the bowling alley.

Pet.'s Proposed Findings of Fact and Conclusions of Law, July 26, 1995, ¶ 238, at 84.

Soffar, furthermore, argued that "counsel unreasonably failed to conduct an analysis of the ballistics evidence in the State's possession, which would have shown that, contrary to the State's unfounded contentions and the version of events set forth in [Soffar's] Statement, only four shots were fired in the bowling alley, not five." <u>Id.</u> ¶ 292, at 111.  In addition, he contended that "counsel failed to analyze the ballistics evidence relating to the location and order of the victims in which they had been shot,

53

evidence which, again, conflicted with [Soffar's] Statement, but which was consistent with a number of statements given to the police by the only eyewitness to the offense, Garner, whom defense counsel failed to interview." Id. ¶ 293, at 111. And, Soffar complained that "counsel failed to retain and work with a ballistics expert who could have explained the significance of the ballistics evidence to the jury and brought out the inconsistencies between the physical evidence, on the one hand, and [Soffar's] Statements and the theory of the case presented by the State on the other." Id. ¶ 294, at 111. As Soffar notes, these facts were not explicitly raised in his pleadings because they were not discovered by his appointed defense counsel. Rather, these facts came to light during discovery for the state habeas proceeding. When factual matters not raised by the pleadings are introduced during an evidentiary hearing, those facts are treated "in all respects as if they had been raised in the pleadings." TEX. R. CIV. P. 67.

The fact that the Texas Court of Criminal Appeals did not make an explicit ruling on Soffar's ineffective assistance of counsel claim bears no weight on whether the claim has been exhausted. Once a federal claim has been submitted to the state's highest court, the exhaustion requirement is satisfied, even if the state court fails to address the federal claim. Ridgway v. Baker, 720 F.2d 1409, 1412-13 (5th Cir. 1983) (citing United States v. Digmon, 434 U.S. 332, 333-34 (1978)); Carter v. Estelle, 677 F.2d 427 (5th Cir. 1982) (determining that when "the substance of the

54

petitioner's claims is brought to the state court's attention, the fact that the court does not explicitly pass on the claims is irrelevant to the question of exhaustion, because the opportunity to consider them has been presented").

Based on the numerous instances cited herein in which Soffar presented to the state habeas court his ineffective assistance counsel claim as it relates to Garner's statements and the ballistics evidence, it is clear that Soffar sufficiently exhausted his state court remedies.

**B.     Whether Soffar's Ineffective Assistance of Counsel Claim Was Properly Raised in the District Court.**

Likewise, we also conclude that Soffar properly presented to the district court his claims that his defense counsel were deficient because: 1) they failed to investigate and raise readily apparent inconsistencies between a) facts to which Garner would have testified that tended to exculpate Soffar, and b) Soffar's statements given under interrogation to investigating officers, the only link between Soffar and the charged offense; and 2) they failed to retain an expert to examine and develop the ballistic evidence.

**i.     Federal habeas petition**

In Soffar's federal habeas petition filed April 22, 1996, his first ground for relief alleges that:

> Petitioner Was Denied The Effective Assistance of Counsel In Violation Of The Sixth and Fourteenth Amendments To The United States Constitution As A Result Of Defense

55

Counsels' Unreasonable Failure To Investigate, Develop And Present Evidence And Argument At The Guilt Phase Supporting Their Chosen Theory Of Defense And Undermining The Reliability Of Petitioner's Written Statements To The Police.

Pet.'s App. Habeas Corpus, at 15. Albeit a general claim for ineffective assistance of counsel, Soffar is clearly asserting a claim that encompasses both the Garner statements and the ballistics evidence.

Soffar provides additional detail in support of his first ground for habeas relief, arguing that:

> [h]aving chosen to present the defense that Max's written statements to the police were not credible proof that Max had been involved in the Fairlane-Windfern offense . . ., Max's trial counsel had a duty to conduct a reasonable pretrial investigation for evidence supporting the chosen defense.

Id. ¶ 45, at 17.

The Garner statements and the ballistics evidence would have certainly supported defense counsel's proffered defense theory that Soffar's statements to officers did not constitute credible proof that he was guilty of the crime for which he was charged and ultimately convicted. As noted previously, the Garner statements would have established numerous contradictions to Soffar's account of the events that transpired at the bowling alley. In addition, the presentation of testimony relating to the ballistics evidence certainly would have cast reasonable doubt on Soffar's statement that five shots had been fired rather than four as the combined weight of the bullet fragments recovered and accounted for in

56

connection with the crime approximated that of only four bullets. Had defense counsel conducted a reasonable pretrial investigation, these two issues in particular would have provided the necessary support for their defense theory that Soffar's statements to police were not credible proof of his guilt.

Moreover, Soffar specifically alleges that defense counsel:

> unreasonably limited their investigation of Max's involvement in the crime charged and of the credibility of Max's statements to the police to examining the evidence contained in the State's file pursuant to the State's purported "open file" policy. Defense counsel conducted no investigation of these matters beyond reading those materials made available from the prosecution's file.

Id. ¶ 47, at 17-18 (internal citation omitted).

Again, this allegation sets forth a specific ground for relief, identifying defense counsel's failure to investigate the sources of evidence not in the State's file, i.e., the Garner statements, the ballistics evidence, as well as interviews of Garner himself. Whether the Garner statements were in fact included in the State's file, defense counsel's inability to identify and utilize those statements clearly supports a claim of ineffectiveness of counsel. Further, defense counsel's failure to pursue and develop expert testimony relating to the ballistic evidence that would have presented the jury with conflicting evidence as to the number of shots actually fired during the commission of the crime likewise supports an ineffective assistance claim. Finally, defense counsel were also ineffective in failing

57

to contact Garner when doing so would have clarified the extent to which Garner could have assisted them in contradicting the statements attributed to Soffar.

In Soffar's third ground for habeas relief in his federal petition, he alleges that the State violated <u>Brady</u> by failing to disclose certain evidence, including evidence indicating that only four spent bullets had been recovered from the crime scene. Soffar argues that:

> [h]ad defense counsel physically examined the ballistics-related evidence, or engaged competent experts to do so, they would have been aware that (i) there were only four recovered bullets, not five, and (ii) the pattern of the holes in the carpet, and the fact that one hole did not go all the way through the carpet pad, as did the other three, was inconsistent with a theory that they were caused by one "warning" shot and three bullets existing from victims . . . .

<u>Id.</u> ¶ 128, at 57-58.

Although this specific allegation is found under Soffar's third ground for habeas relief, <u>i.e.</u>, his <u>Brady</u> claim, there is nothing in our habeas jurisprudence that requires a party to raise a constitutional issue on appeal under a particular heading. As such, this specific allegation explicitly and adequately sets forth a ground for relief on Soffar's ineffective assistance of counsel claim as it relates to defense counsel's failure to identify and develop the ballistics evidence.

### ii. Soffar's summary judgment motion filed in district court

Soffar again raises the issues relating to his defense

58

counsel's failure to investigate the Garner statements and ballistics evidence in his summary judgment motion filed with the district court. In his Statement of Facts, Soffar argues that "[d]efense counsel's failure to investigate, develop and present available evidence and pertinent argument during the guilt phase of the trial . . . would have provided strong support for the chosen theory of the defense and would have undermined the statements signed by [Soffar]." Pet.'s Mem. Supp. Summ. J., at 97. Specifically, Soffar identifies defense counsel's failure in identifying and investigating "the extent to which [Soffar's] statements were <u>not</u> corroborated by the evidence pertaining to the offense." <u>Id.</u> at 97-98.

Importantly, Soffar inserts a footnote to the above statement, referencing the district court to Appendix B of his motion, attached thereto, in which Soffar expounds on at least ten major discrepancies between his written statements given to police and the Garner statements. This appendix attached to Soffar's summary judgment motion provides an explicit and detailed elaboration of Soffar's claim that his defense counsel failed to investigate and utilize both the Garner statements and the ballistics evidence. The appendix sets out the scope and nature of Garner's statements to police and meticulously compares them to the third written statement provided by Soffar to investigating officers. Noting the numerous discrepancies between the two accounts, Soffar argues:

In light of his prior statements to the police, and his

59

failure to identify [Soffar] at a line-up, Garner's testimony would not have supported the case presented by the prosecutors based on [Soffar's] Statement and, indeed, would have contradicted it in numerous key respects noted above. Accordingly, the prosecutor falsely told defense counsel that Garner was a "vegetable," and defense counsel accepted this false information, <u>making no attempt to even contact Garner prior to trial</u>. <u>None</u> of the numerous discrepancies between [Soffar's] Statement and the evidence, as set forth herein, were brought out at trial, and there is nothing in the trial record to indicate that defense counsel were ever even aware of these discrepancies — including the key fact that the physical, ballistics-related evidence consisted of <u>four</u> bullets and was thus inconsistent with the firing of <u>five</u> shots in the bowling alley, as set forth in [Soffar's] Statement, as well as the numerous details pertaining to the "warning-shot" scenario set forth in [Soffar's] Statement.

<u>Id.</u> ¶ 38, at 24 (first emphasis added). It is clear from Soffar's argument above that the district court was presented with his claim that he was denied the effective assistance of counsel both as to Garner's statements and the ballistics evidence.

Soffar further alleges in his summary judgment motion that:

Because defense counsel did not bring out the evidence contradicting the State's theory, due to the fact that the State had withheld [Garner's statements and ballistics-related] evidence, the Texas Court of Criminal Appeals (as had the jury) accepted the misleading version of the evidence with respect to the order of the victims put forth by the State as "corroboration" for the [Soffar's] Statement, and found that the evidence:
established that the bodies of the victims were found in a line basically parallel, in order of Temple, Sims, Welsher and Garner, <u>with Garner's body closest to the door</u>, and all facing in the direction of the snack bar. Appellant's statement: "They were lying from the door so that there was a dude then a girl and then another dude and then the last dude," and "They were all facing back towards the snack bar."
Petitioner's defense counsel, having been advised by the

60

prosecutor that Garner was a "vegetable" who was unavailable to testify, failed to take any steps to bring out the critical contrary evidence relating to the position of the victims at the time they were shot, as indicated by the actual evidence collected by the police, or to counter the prosecutor's false "five-shot" scenario, and the "evidence" proffered and argument crafted by the state in support thereof.

Id. ¶ 42, at 27.

In support of the argument that Soffar failed to raise these issues before the district court, the dissent points to the fact that the district court did not make a specific ruling on Soffar's ineffective assistance of counsel claim as to Garner's statements and the ballistics evidence.[36] However, this Circuit has determined that all claims not disposed of explicitly in a judgment are considered to have been implicitly rejected by the district court. Schmueser v. Burkburnett Bank, 937 F.2d 1025, 1030 (5th Cir. 1991) (citing 50 C.J.S. § 539)). Therefore, the federal district court's failure to make an explicit ruling on Soffar's claims regarding the Garner statements and the ballistics evidence is not dispositive of whether they were properly raised.[37] Rather, this fact reflects

---

[36] Alternatively, Judge Garza suggests in his dissent that the district court did not address Soffar's claim as to the Garner statements because the claim had not been presented to the district court. However, as detailed above, we have identified at least five instances in which Soffar presents to the district court both general and specific references to his defense counsel's failure to investigate the statements made by Garner to police.

[37] While Judge Garza concedes that Soffar's ineffective assistance of counsel claims were raised in the appendix to his motion for summary judgment, he maintains, however, that the district court did not rule on these claims, "apparently recognizing that it could not consider claims not raised in the

61

only that the district court, like the state habeas court, simply considered and rejected Soffar's claims of ineffective assistance of counsel without reasons or in general terms.

In sum, it is abundantly clear based on a review of the record that Soffar presented to the district court his contention that defense counsel: 1) failed to investigate and raise readily evident stark inconsistencies between Garner's description of the shootings and the one that the officers testified that Soffar gave them; and 2) failed to retain an expert to examine and develop the ballistic evidence, and that such deficiencies supported Soffar's ineffective assistance of counsel claim.

## C.  Whether Defense Counsel were Ineffective at the Guilt Phase Due to Their Failure to Conduct an Adequate Pretrial Investigation

Having determined that exhaustion is not a bar and that the relevant issues were properly raised before the district court, we turn to the substance of Soffar's ineffective assistance of counsel

---

habeas application." (emphasis added).  The tentativeness of Judge Garza's position on this point is made more apparent in the support he cites: 28 U.S.C. § 2242 (the general habeas application section) and a 1949 district court decision issued by the Eastern District of Pennsylvania (a case in which a writ of habeas corpus was dismissed because the relator was not confined within the territorial jurisdiction of the court at the time the suit was instituted).  To hold that these claims were not properly raised simply because the district court elected not to specifically address them would have questionable and undesirable effects on our habeas jurisprudence.  If we were to accept Judge Garza's suggestion, then any ground for habeas relief not explicitly adjudicated by a district court would risk being procedurally barred solely on account of that omission.

claim. Soffar contends that he received ineffective assistance of counsel during the guilt phase of his trial because his counsel failed to conduct an adequate pretrial investigation. Under the two-prong test enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984), counsel's assistance must have been deficient and that deficiency must have prejudiced the defendant. In evaluating the first prong, judicial scrutiny of counsel's performance must be highly deferential, and courts must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. at 689. Under the second prong, prejudice must be demonstrated by showing that the defendant's counsel's errors were so serious that they rendered the proceedings fundamentally unfair or the result unreliable. Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

Soffar contends that his defense counsel were ineffective for failing to conduct an adequate pretrial investigation for two reasons. First, Soffar argues that his defense counsel were ineffective in not attempting to contact Greg Garner or to interview the police officers who took Garner's statements, which would have enabled Soffar's counsel to introduce into evidence the significant discrepancies between Garner's account of the crime and Soffar's statements. Soffar contends that had his defense counsel done so, the reliability of his confessions would have been undermined. According to Soffar, this would be particularly true given that the jury would have been made aware that Garner's

63

account and the ballistics evidence were substantially consistent, whereas Soffar's version conflicted with both.  Soffar further notes that the jury would have learned that Garner had described the gunman as a lone robber and could not identify Soffar or Latt Bloomfield as the offender at two line-ups conducted by the police.[38]  The result, according to Soffar, is that the plausibility of the statements attributed to him by the police would have been placed in substantial doubt by a reasonable juror.

The State, on the other hand, contends that defense counsel's failure to call Garner to the stand or introduce his statements to police was not harmful to the defense.  According to the State, placing Garner on the stand would have risked an in-court identification of Soffar and "damning recollections spurred by an in-court confrontation with the assailant."  The State, therefore, argues that "[t]here was simply nothing to be gained from

---

[38] We also observe here that although Soffar named Bloomfield as his leader and accomplice in the bowling alley murders when he confessed, according to the State, Bloomfield was released and never charged with the crime because of a "lack of evidence." Despite this, Soffar's counsel never attempted to locate and interview Bloomfield prior to trial, obtain any statements he may have made to police, or inquire further into the reasons for Bloomfield's release, including whether Bloomfield had an alibi which cast doubt on the reliability of Soffar's confessions. Because "[c]ounsel has 'a duty . . . to investigate all witnesses who allegedly possessed knowledge concerning [the defendant's] guilt or innocence,'" this appears to be yet another potential basis for finding that Soffar's counsel were deficient in their performance. See Bryant v. Scott, 28 F.3d 1411, 1419 (5th Cir. 1994) (quoting Henderson v. Sargent, 926 F.2d 706, 711 (8th Cir. 1991)). But because Soffar did not raise this issue in his habeas petition, we will not consider it in connection with the first *Strickland* prong.

attempting to get the substance of the [Garner] statements before the jury." Without further investigation and subsequent careful consideration of the probable impact of Garner's testimony or statements, however, the State's assertions are not persuasive.

Second, Soffar argues that his counsel were ineffective for failing to retain a ballistics expert and introduce evidence concerning the discrepancies between ballistics-related evidence and Soffar's statements. According to Soffar, his counsel should have identified several troubling anomalies, which even a cursory examination of the State's ballistics evidence revealed. Specifically, Soffar notes that the State argued the bullet fragments recovered at the scene of the crime constituted five bullets, which, according to the police interrogators, is the number of bullets Soffar said had been fired. The State's theory was that Bloomfield (who the State released for lack of evidence) fired a warning shot and then shot two of the victims once, and then gave the gun to Soffar who shot the other two victims once. Soffar argues that, had his defense counsel properly prepared, they would have been able to present evidence that the fragments constituted the weight of only four bullets, as the State Firearms Examiner alternatively found. This proof, according to Soffar, corroborates Garner's account that no warning shot was fired.

Soffar also contends that another significant discrepancy a ballistics expert would have highlighted is that the police discovered Garner in a location different from where he said he was

shot.  Soffar's statement to police placed Garner between Felsher and the front doors of the bowling alley.  Garner, however, told police that he was shot while lying between Sims and Temple; and he stated that after making a phone call he lay down by Felsher's side in an attempt to aid her, which is where the police found him.

### i.    Whether counsel were deficient

We first consider whether Soffar satisfied the first prong of Strickland, i.e., whether counsel's performance was deficient. 466 U.S. at 687.  To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."  Id. at 688.  The Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id.  We begin our analysis by noting that, as in Strickland, Soffar's claim stems primarily from his trial counsel's decision to limit the scope of their investigation into potential evidence favorable to the defendant. Id. at 672-74.  In rejecting Strickland's claim, the Supreme Court defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel

has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91.

The scope of a defense counsel's pretrial investigation necessarily follows from the decision as to what the theory of defense will be. At the state habeas proceeding, both Cannon's and Stover's testimony made it clear that their defense theory was that Soffar's self-incriminating statements were false and should not be believed. Nevertheless, in spite of this theory of defense, Soffar's defense counsel never attempted to interview Garner, the only known eyewitness, to (1) obtain his description of the perpetrator[s] and his version of the crime events; to (2) determine whether he could testify at trial, the substance of his potential testimony, and whether it would be consistent with his taped and transcribed statements and any other information he gave to the police; and (3) whether he could identify the perpetrator[s], had already done so, or attempted to do so. Defense counsel testified that they did not seek to interview Garner because an unspecified person told them Garner was a "vegetable."

"Guided by Strickland, we have held that counsel's failure to interview eyewitnesses to a charged crime constitutes 'constitutionally deficient representation.'" Anderson v. Johnson,

67

338 F.3d 382, 391 (5th Cir. 2003) (quoting Bryant v. Scott, 28 F.3d 1411, 1418 (5th Cir. 1994)).  In Bryant, the defense counsel did not interview two eyewitnesses and limited his pretrial investigation to examination of the prosecutor's file, discussions with the accused, and a review of the indictment. 28 F.3d at 1418. We observed that "information relevant to [the] defense might have been obtained through better pretrial investigation of the eyewitnesses, and a reasonable lawyer would have made some effort to investigate the eyewitnesses' testimony." Id. (alteration in original) (citation and quotations omitted).  In Anderson, we held that a trial counsel's failure to interview an eyewitness rose to the level of constitutionally deficient performance, given the gravity of the burglary charge, and the fact that there were only two adult eyewitnesses to the crime; and that counsel relied exclusively on the investigative work of the State, basing his own pretrial "investigation" on "assumptions divined from a review of the State's files." Id.

We conclude that Soffar's defense counsel have offered no acceptable justification for their failure to take the most elementary step of attempting to interview the single known eyewitness to the crime with which their client was charged.  We conclude that this failure is sufficiently deficient to satisfy the first prong of Strickland.

As we discussed supra, Garner provided the police with four

68

statements and a post-hypnotic interview concerning the crime. Those statements were in the prosecutor's files prior to the trial, and the state habeas court made an express finding that there was no <u>Brady</u> violation because the prosecutor followed an open file policy and kept all reports in Soffar's file, which defense counsel accessed on multiple occasions.[39] The necessary corollary of this finding is that, except for their gross neglect or oversight, Soffar's counsel must have been aware of the existence of Garner's statements. Garner's statements, as clearly shown in **"Appendix A",** markedly conflict with Soffar's statements in a number of significant ways, including:

(1)  the number of perpetrators;

(2)  whether the perpetrator(s) wore a disguise;

(3)  the manner in which the perpetrator(s) gained

---

[39] The district court in this habeas proceeding concluded:

> In light of the undisputed fact that Officer Rushing's report was made available to defense counsel, Soffar also knew or should have known that the police had recovered bullets and bullet fragments weighing less than the weight of five bullets. Accordingly, Soffar already knew or should have known of the "essential facts" of the purported inconsistency between his "five shots" confession and C.E. Anderson's calculation of "four bullets' weight" for the weight of bullets and bullet fragments recovered by the police. Because Soffar from other available sources "either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence," it can only be concluded that the ballistics evidence was not "suppressed" within the meaning of Brady.

<u>Soffar v. Johnson</u>, No. 96-1281, Aug. 7, 1997 Memorandum and Order, at 56.

access to the bowling alley;

(4) whether any of the victims screamed;

(5) the number of shots fired by the perpetrator(s);

(6) the victims' positions at the time they were shot; and

(7) how the perpetrator(s) went about emptying the cash register.

Defense counsel, however, chose not to utilize Garner's statements to show reasonable doubt as to the reliability of Soffar's statements and as to whether they were based on his own observations. Furthermore, defense counsel never attempted to interview Garner to determine whether there were any additional inconsistencies that could aid Soffar's defense or whether it would be worth having Garner testify at trial. During the state habeas proceedings, Soffar's defense counsel stated that they did not do so because they had been told by an unspecified person that Garner was a "hopeless vegetable" who could not talk or recognize anyone.

The State argues that defense counsel's decision not to call Garner to testify was excusable as a reasonable and strategic decision. Specifically, the State argues that had Soffar's defense counsel placed Garner on the stand, they would have risked an in-court identification of Soffar by Garner and a potential series of "damning recollections spurred by an in-court confrontation with the assailant." However, an actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results. This Court has squarely rejected the State's rationale

70

here — that a failure to interview a witness is excusable as a "strategic decision" if the witness would not have been credible — holding that while:

> a lack of credibility might support a strategic decision not to call a witness to <u>testify</u> at trial, we explained that a witness's character flaws cannot support a failure to <u>investigate</u>. Without so much as contacting a witness, much less speaking with him, counsel is "ill-equipped to assess his credibility or persuasiveness as a witness." . . . <u>Strickland</u> simply does not "require . . . defer[ence] to decisions that are uninformed by an adequate investigation into the controlling facts and law."

<u>Anderson</u>, 338 F.3d at 392 (alteration in original) (citations omitted).

> As we stated in <u>Soffar I</u>:

> We find counsel's defense strategy in this regard to be inexplicable. Given the powerfully exculpatory nature of the inconsistencies between Garner's account of events and Soffar's confession, which inconsistencies would render Soffar's confession implausible, one would have expected defense counsel to do everything in their power to get the substance of Garner's police interviews before the jury either by calling Garner as a witness or by introducing the transcription of these interviews. Defense counsel should have at least interviewed Garner to determine if he could and would testify at Soffar's trial consistent with his (Garner's) prior statements. If Garner was not able or willing to so testify, defense counsel should have offered the prior statements, recorded and transcribed by the police, as record evidence of his testimony. Simply put, we are baffled by defense counsel's strategy, or complete lack thereof, regarding Garner's statements to the investigators.

<u>Soffar I</u>, 237 F.3d at 440 n.44. We believe these words continue to ring true particularly given that Garner was the only eyewitness to the crime. In addition, Garner's description of the perpetrator was used to create a drawing that police circulated and the news

71

media broadcast to the public, which indicates that the police believed Garner had sufficient recollection to identify the suspect and thus was not a "hopeless vegetable."

Finally, had Soffar's counsel investigated the circumstances of Garner's statements, they would have realized the value in putting before the jury the fact that Garner could describe the gunman but could not identify Soffar or Latt Bloomfield at two line-ups conducted by the police. We are convinced that such proof probably would have raised reasonable doubt in the minds of the jurors.

Defense counsel knew that Garner, the only surviving victim and eyewitness to the crime, was still alive and possibly available for them to interview. They also knew that the State had possession of Garner's transcribed statements containing significant exculpatory materials. Because defense counsel knew before trial that there was no evidence independent of Soffar's confessions that tended to connect him with the crimes, that the State would not call Garner as a witness, and that Garner's statements to the police conflicted markedly with Soffar's confessions and substantially tended to exculpate Soffar, there was an apparent reasonable possibility that information and evidence favorable to Soffar's defense could have been obtained through pretrial investigation and interviews of Garner; furthermore, a reasonable lawyer would have made efforts to investigate whether Garner could testify favorably and decide whether Garner's

72

transcribed statements could and should be introduced as exculpatory evidence. See Anderson, 338 F.3d at 391-92; Bryant, 28 F.3d at 1418 (citing Kemp v. Leggett, 635 F.2d 453, 454 (5th Cir. 1981)); Gaines v. Hopper, 575 F.2d 1147, 1149 (5th Cir. 1978).

The Supreme Court recently determined that "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins v. Smith, 123 S. Ct. 2527, 2538, 156 L. Ed.2d 471 (2003). Under the circumstances of this case, we conclude that Soffar's defense counsel's failure to interview Garner, and carefully determine whether to use his prior recorded statements or live testimony at trial was constitutionally deficient performance. See Bryant, 28 F.3d at 1418 (finding that counsel's "failure to interview eyewitnesses to the crime was constitutionally deficient performance").

We also agree with Soffar that his defense counsel were deficient in not seeking out a ballistics expert when there were such readily apparent discrepancies between the ballistics evidence and the State's theory of the case. The State's theory relied heavily on ballistics evidence to show a correlation between the statement attributed to Soffar and the crime scene. Yet Soffar's defense counsel never even consulted with a ballistics expert. Defense counsel were aware of the inconsistencies between Garner's

73

statements and Soffar's confessions regarding both the number of shots fired and the location of the victims when the shootings occurred. The defense counsel also were aware from the prosecution's file that the police recovered bullets and bullet fragments weighing less than the total weight of five bullets, which tended to corroborate Garner's account of the events. Considering this, it was objectively unreasonable for defense counsel to fail to consult with a ballistics expert to determine whether they could develop expert testimony as to physical evidence that tended to undermine the credibility and reliability of Soffar's confessions.

In <u>Strickland</u>, the Supreme Court recognized that an ineffective assistance of counsel claim based on the "failure to investigate" increases the temptation to rely on hindsight. 466 U.S. at 689. Thus, the Court noted that "strategic choices <u>made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable</u>." <u>Id.</u> at 690 (emphasis added). The Court, however, went on to say that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Id.</u> at 690-91.

74

In _Wiggins_, the Supreme Court set out to determine whether the attorneys in the underlying capital murder trial exercised "reasonable professional judgmen[t]" in their investigation and presentation of mitigating evidence during the penalty phase of the trial. 123 S. Ct. at 2535-42 (quoting _Strickland_, 466 U.S. at 691 (alteration in original)). In doing so, the Court focused not on whether defense counsel should have presented a mitigation case during sentencing, but rather on whether "the investigation supporting counsel's decision not to introduce mitigating evidence was itself reasonable." _Id._ The Court thereafter engaged in an objective review of defense counsel's performance, measuring it for "reasonableness under prevailing professional norms." _Id._ (citation and quotation omitted). The Court's review documented counsel's efforts in investigating mitigating evidence, which included: (1) arranging for a psychological review of the defendant; (2) reviewing the pre-sentence investigation report; and (3) reviewing the state records reflecting the defendant's various placements within the state's foster care system. _Id._ at 2536-37. The Court concluded that defense counsel's "decision not to expand their investigation beyond the [pre-sentence and social services] records fell short of the professional standards" that prevailed at the time. . . . [C]ounsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." _Id._

Applying the framework established in _Wiggins_ for determining

75

objective reasonableness to the present case, the deficiencies identified in the performance of Soffar's defense counsel are made even more apparent.[40] As discussed previously, at trial, Soffar's counsel neither presented Garner as a witness nor raised the inconsistencies between Soffar's written statements and the statements made by Garner to the police. In analyzing defense counsel's decision not to present such evidence, we focus on whether the investigation leading up to the decision not to call Garner as a witness or raise these inconsistencies "was itself reasonable." Wiggins, 123 S. Ct. at 2536. The record reflects that Soffar's counsel simply asked an unspecified person about Garner and were told that Garner was a "vegetable." Moreover, defense counsel were aware that the State was not going to call Garner, the only surviving victim and eyewitness to the crime, as a witness. As we have observed repeatedly, defense counsel's decision to not even attempt to interview Garner upon learning this information is remarkable, and the failure to pursue even the most limited of

---

[40] We recognize that Wiggins was decided in the context of a defense counsel's decision regarding whether to offer a mitigation case during the sentencing phase of the trial. However, this is a difference without distinction. Whether the failure to conduct a reasonable investigation occurs at the sentencing phase or the guilt phase should warrant no meaningful distinction in defining a person's right to effective assistance of counsel. The two-prong test established in Strickland applies to both phases of trial. See Pondexter v. Dretke, 346 F.3d 142, 146-47 (5th Cir. 2003) (applying Strickland analysis to ineffective assistance claim involving guilt phase of capital murder trial); Smith v. Cockrell, 311 F.3d 661, 668-69 (5th Cir. 2002) (applying Strickland to ineffective assistance claim involving penalty phase of capital murder trial).

76

investigations into these matters certainly falls below an objective standard of reasonableness.

Likewise, Soffar's defense counsel chose to do nothing about the ballistics evidence. Had they investigated the evidence and consulted a ballistics expert, they would have been able to make a strategic decision as to whether such information would have helped Soffar's defense. As was made evident during the state habeas proceedings, Soffar's defense counsel would not have had to look far to find a ballistics expert who could have provided testimony to aid his defense.

After analyzing the ballistics evidence, Professor Kenneth Braunstein testified on behalf of Soffar during the state habeas proceedings that the "extra" bullet hole in the carpet, which led the State to conclude that five bullets were fired instead of four, was made by the same bullet that had made a hole in the carpet about a foot away. Braunstein also testified that the shootings likely were not committed in the manner described by Soffar in his statements. Specifically, Braunstein testified that when shot, Felsher was the victim closest to the front door of the bowling alley, and the pattern of the victims' locations when shot was female-male-male-male (Felsher-Sims-Garner-Temple) as Garner had told police (see **"Appendix B"**), rather than male-female-male-male (Garner-Felsher-Sims-Temple) as indicated by Soffar's written statements (see **"Appendix C"**). Ignoring such evidence under the

77

circumstances of this case simply cannot be characterized as the reasonable exercise of professional judgment. <u>Strickland</u>, 466 U.S. at 691.

Soffar's defense counsel, therefore, were deficient for two reasons. First, although defense counsel knew that Garner was the only known eyewitness, were aware the State did not plan to call Garner as a witness, and had access to Garner's taped and transcribed statements, they did not investigate whether the discrepancies between Soffar's written statements taken by the police and Garner's potential testimony or taped and transcribed accounts of the crime would aid the defense. Second, Soffar's defense counsel failed to consult with a ballistics expert although the State's case was largely based on the testimony of a ballistics expert to show a correlation between the physical evidence at the scene of the crime and Soffar's written statements. In our view, Soffar's defense counsel did not make a reasonable decision that further investigation was not necessary with regards to these two aspects of the case. In fact, during the state habeas proceeding, Soffar's defense counsel offered no reasonable explanation for why they did not take advantage of these opportunities. Failing to do so can not be described as a reasonable exercise of professional judgment or as "part of a calculated trial strategy, but is likely the result of either indolence or incompetence." <u>Anderson</u>, 338 F.3d at 393 (citation and quotations omitted). Therefore, we find that Soffar's defense counsel's failure to investigate these key avenues

78

of evidence was constitutionally deficient, thus satisfying the first prong of Strickland.

**ii. Whether counsel's deficient performance prejudiced Soffar**

We must now address the prejudice prong of the Strickland analysis. Under the prejudice prong of Strickland, Soffar must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. Rather, the test we must apply is whether there is a reasonable probability that counsel's errors affected the outcome of the trial. "A reasonable probability need not be proof by a preponderance that the result would have been different, but it must be a showing sufficient to undermine confidence in the outcome." Williams v. Cain, 125 F.3d 269, 279 (5th Cir. 1997) (citing Strickland, 466 U.S. at 694) (internal quotations omitted).

We are of the opinion that Soffar's defense counsel's failure to conduct an adequate pretrial investigation had a clear negative impact on the outcome of the trial. The evidence of Soffar's guilt in this case was not so extensive as to render harmless defense counsel's errors. To the contrary, the State predominately relied on Soffar's self-incriminating statements despite his history of confessing to crimes he did not commit. This is particularly important when Soffar's statements conflict with the account given

79

by Garner, the sole witness to the crime. Under the circumstances of this case, therefore, we are persuaded that the verdict against Soffar was more likely than not to have been affected by counsel's ineffectiveness.

This is absolutely not a case where there was clear objective evidence of Soffar's guilt. No eyewitness testimony placed either Soffar or Bloomfield at the crime scene. No fingerprints lifted from the crime scene matched the fingerprints of either Soffar or Bloomfield. Nothing was taken from the crime scene and later found in the possession of either Soffar or Bloomfield. No blood or hair samples were found at the crime scene that matched those of Soffar or Bloomfield. The gun used to commit this crime was neither found nor introduced into evidence. Neither Soffar nor Bloomfield were linked to a weapon of the same caliber as the bullets recovered from the crime scene. Nothing Soffar told the police in his statements led the police to discover any evidence they did not already have relating to the bowling alley murders.

On the contrary, the arguably incorrect pattern of the shootings deduced by the police from the victims' ultimate floor positions led to statements by Soffar fitting that pattern. Because of the ineffectiveness of Soffar's defense counsel, the jury never heard about the significantly different description of what happened at the crime scene contained in the statements Garner made to the police. Because of the ineffectiveness of Soffar's defense counsel, the jury never heard the contrary opinions of an

80

available qualified ballistics expert that only four shots were fired (not five as Soffar's statements purported to say), and that the arrangement of bullet holes in the carpet clearly showed that Garner was shot in a different place from where he was found by police (and not where Soffar said he shot him).

Had the jury been confronted with this considerable evidence favorable to Soffar, there is a reasonable probability it would have reached a different result. In particular, had the jury been so confronted, there is a reasonable probability that at least one juror would have refused to return a verdict of guilty. The available evidence casting doubt on the truth and veracity of Soffar's confessions is strong enough that the failure to present any of it for the jury's consideration undermines confidence in the outcome. Strickland, 466 U.S. at 694. In light of the State's relatively thin case consisting only of an uncorroborated confession, there is a reasonable probability that "but for" trial counsel's failure to: (1) interview and call Garner to testify or introduce his transcribed statements; and (2) consult a ballistics expert of their own to reconstruct the crime scenario for the jury in accord with Garner's testimony or statements, the result of the proceeding would have been different.

Although Soffar's burden in this case is substantial, he is not required to establish his innocence or even demonstrate "that counsel's deficient conduct more likely than not altered the outcome in the case." Strickland, 466 U.S. at 693. In order to

establish prejudice, Soffar need only show that had his defense counsel conducted an adequate pretrial investigation as discussed above, there is a reasonable probability that the jury's verdict would have been different. Id. at 694. Soffar has met this burden.[41]

**D. Whether the State Violated Soffar's Constitutional Rights in Conducting Interrogations Subsequent to Indictment and Invocation of the Right to Counsel**

Because we determine that Soffar is entitled to habeas relief based on the merits of his ineffective assistance of counsel claim, we need not address the second issue before us for which this panel

---

[41] This Circuit has found the constitutionally deficient performance of counsel to be prejudicial on numerous occasions. See, e.g., Anderson v. Johnson, 338 F.3d 382, 393-94 (5th Cir. 2003) (finding prejudice in a "relatively 'weak' case" against the defendant where counsel failed to interview one of only two eyewitnesses to the crime in which there was no physical evidence linking defendant to the offense); Beltran v. Cockrell, 294 F.3d 730, 733-35 (5th Cir. 2002) (finding prejudice where defense counsel decided not to impeach eyewitnesses' testimony that defendant was only person whom they had picked from photographic array with the witnesses' prior tentative identifications of another party); Lockett v. Anderson, 230 F.3d 695, 715-17 (5th Cir. 2000) (holding that defendant was prejudiced under Strickland based on counsel's failure to investigate mitigating evidence relating to defendant's mental condition); Moore v. Johnson, 194 F.3d 586, 619-22 (5th Cir. 1999) (holding that counsel's failure to investigate by interviewing witnesses disclosed to counsel by the state and counsel's failure to proceed reasonably in light of that evidence once disclosed prejudiced the defendant); Gray v. Lynn, 6 F.3d 265, 269-71 (5th Cir. 1993) (finding prejudice based on an erroneous jury instruction where the jury could have had a reasonable doubt concerning the defendant's intent to kill, and instead could have convicted him based on intent to cause great bodily harm).

Based upon a review of the facts in these cases and for the reasons set forth in this opinion, we believe that the circumstances underlying the deficiencies identified in the instant case certainly meet, if not exceed, the prejudicial prong as developed by this Circuit.

82

and the *en banc* Court have previously granted a COA.  We do not consider or address Soffar's additional claim that the State violated his Sixth Amendment rights by interrogating him outside the presence of his counsel of record regarding an extraneous offense that was presented during the penalty phase of his trial. We are required to grant Soffar relief from both his conviction and sentence because of the constitutionally ineffective assistance of his counsel.  Therefore, our pronouncement on Soffar's extraneous offense claim would be unnecessary and merely advisory.

## CONCLUSION

Based on the foregoing, we hold that Soffar's conviction and sentence for capital murder are constitutionally infirm by virtue of the ineffectiveness of Soffar's defense counsel.  Therefore, we REVERSE the order of the district court granting summary judgment in favor of the Director, and REMAND this case to the district court for entry of an order (i) granting Petitioner Max Alexander Soffar's petition for writ of habeas corpus; (ii) setting aside his conviction and sentence for capital murder; and (iii) ordering the release of Petitioner Max Alexander Soffar from custody unless the State commences a retrial of the Petitioner within 120 days.  All pending motions are hereby DENIED as MOOT.

**REVERSED** and **REMANDED.**

EMILIO M. GARZA, Circuit Judge, dissenting:

We do not have jurisdiction to consider Soffar's ineffective assistance of counsel claims because he failed to raise them in his federal habeas application and because the district court never ruled on them. Further, Soffar's claim that his Sixth Amendment rights were violated when he was interrogated regarding an unrelated sexual assault charge is without merit. Thus, I respectfully dissent.

I

Soffar requests that we consider whether he was denied effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). He argues that his trial counsels were deficient in failing to investigate and bring out inconsistencies between his confession to the murders and Greg Garner's account of the offense;[42] and were deficient in failing to retain an expert to examine certain ballistics evidence.

Soffar's federal habeas application raised twenty-four grounds for relief. Eight of those grounds raised *Strickland* claims: Ground I alleged trial counsels failure to investigate Soffar's medical history and his personality; Ground II, alleged their failure to raise a Fifth Amendment challenge to Soffar's confession; Ground IV, alleged their failure to investigate an unrelated prior act of violent misconduct; and Ground XIX, alleged their failure to object to the court excusing a particular juror. Ground IX, X, XIII, and XIV related solely to the penalty phase of Soffar's trial and did not refer either to Garner's statements or the ballistics evidence.[43]

None of the *Strickland* claims raised in Soffar's habeas petition alleged his counsels' failure

---

[42] Greg Garner was shot in the head and left for dead on the night of the murders. He survived and gave an accounting of the crime to the police.

[43] The district court denied Soffar relief on each of these claims.

to retain a ballistics expert, develop ballistics evidence, or develop evidence with respect to Garner's statements. As the majority opinion notes, Ground I most closely resembles the claims presently before this Court, but a closer inspection clarifies their incongruence. Ground I presented multiple theories of why Soffar's trial counsel failed to fully investigate and develop the presented defense that Soffar's statements to the police were the product of his *mental condition*. It alleged counsels failure to investigate and develop: 1) evidence contained in the State's file; 2) evidence relating to Soffar's police interrogation; 3) evidence from persons in Soffar's community relating to his mental state; 4) evidence of Soffar's organic brain damage; and, 5) its effect on his making incriminating statements. Soffar argued extensively about his counsels' failure to investigate and develop evidence of his mental condition, its effect on his willingness to give a false confession, and the fundamental flaws of his confession. He did not argue, however, that his counsels failed to investigate either Garner's statements or the ballistics evidence.

The majority opinion cites language in Ground I that if construed broadly and read in isolation can be interpreted to have raised the *Strickland* claims presently before this Court. Other language in Ground I, however, clarifies that Soffar's *only* claim in that ground for relief was that his trial counsels' failed to investigate his *mental condition*:

> "Defense counsel argued to the jury at trial that Max's statements to the police were the product of his *mental condition*." Pet.'s App. Habeas Corpus, ¶ 44, at 15 (emphasis added).

> "[D]efense counsel unreasonably failed to investigate, develop and present available *medical evidence* that the specific symptoms of Max's permanent organic brain damage seriously undermined the reliability of his incriminating statement." *Id.* at ¶ 51, at 19 (emphasis added).

> "As a result of counsels' unreasonable failure to investigate, critical and available *medical evidence* was never developed or presented to the jury supporting counsels' chosen theory of defense. Counsels' unreasonable failure to present such *medical*

*evidence* constituted ineffective assistance." *Id.* ¶ 61, at 24 (emphasis added).

> "Had counsel undertaken a reasonable investigation, counsel would have learned that Max was born with permanent *organic brain damage*, and that he had acquired, in childhood, additional permanent organic brain damage." *Id.* ¶ 63, at 25.

> "For example, *neuropsychological and neurological examinations* and testing on Max confirms the existence of substantial permanent organic brain damage." *Id.* ¶ 65, at 25.

> "Defense counsel had available to them *psychiatric assistance* for the preparation and presentation of Max's defense." *Id.* ¶ 74, at 33.

The majority opinion concludes that Ground I was a "general claim for ineffective assistance of counsel" which included the claims for which it granted habeas relief. Even a cursory review of the language in Ground I, however, confirms that, like the seven other *Strickland* claims raised in Soffar's habeas petition, it was a specific claim that did not relate to counsels' failure to investigate either the Garner statements or the ballistics evidence.

The majority opinion further finds that Soffar raised these *Strickland* claims in Ground III of his federal habeas application as part of his contention under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963), that the prosecution failed to turnover "material evidence relevant to the guilt phase of Petitioner's trial" in violation of his right to "due process of law under the Fourteenth Amendment of the United States Constitution."[44] In this ground for relief, Soffar does

_____

[44] Ground III: "The State's withholding of material evidence relevant to the guilt phase of Petitioner's trial, which if admitted likely would have mandated suppression of Petitioner's written statements, due to the violation of his Fifth Amendment right to counsel, and convinced Petitioner's jury that a reasonable doubt existed as to whether Petitioner committed the offense charged, denied Petitioner due process of law under the Fourteenth Amendment of the United States Constitution." Pet.'s App. Habeas Corpus, at 53.

Soffar specifically complained: "[T]he State failed to disclose to the defense evidence and information which was material

refer to the prosecution's failure to turnover ballistics evidence. He does not, however, refer either to the need for testimony from a ballistics expert or to the Garner statements. Even if he had made these factual references, he certainly never articulated or even casually referenced the *Strickland* claims presently before this Court.

Under *Brady v. Maryland*, "suppression by the *prosecution* of evidence favorable to an accused upon request violates *due process* where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87 (emphasis added). The fundamental characteristic of a *Brady* claim is misbehavior by a prosecutor, and the constitutional right asserted is due process of law under the Fourteenth Amendment. *See id.* (A "*prosecution* that withholds evidence . . . casts the *prosecutor* in the role of an architect of a proceeding that does not comport with standards of justice . . . .") (emphasis added). The fundamental characteristic of a *Strickland* claim is deficient attorney performance, and the constitutional right asserted is the Sixth Amendment right to counsel. *See Strickland*, 466 U.S. at 687 ("[T]he Court has recognized that the right to counsel is the right to the effective assistance of counsel.") (internal quotations omitted). Considering a *Brady* claim finds fault with a prosecutor under the Fourteenth Amendment and a *Strickland* claim finds fault with one's own attorney under the Sixth Amendment these two types of constitutional challenges to a conviction are not easily confused. It is unlikely that the experienced counsel who drafted Soffar's federal habeas application mistook one of these claims for the other. Unlike many petitioners before this Court, Soffar is *not* proceedings *pro se.* Rather he is currently represented by very competent counsel from one of the top law firms in the country. Presumably these attorneys can distinguish between errors

to the guilt phase of Max's trial and which the State was obligated to produce under the trial court's discovery order and the federal Constitution." Pet.'s App. Habeas Corpus, ¶ 124, at 54.

by a prosecutor under the Fourteenth Amendment and errors by a defense counsel under the Sixth Amendment.

It is simply not true that Soffar "explicitly and adequately" set forth the grounds of his request for relief under *Strickland v. Washington* as part of his claim seeking relief under *Brady v. Maryland*. The majority opinion's conclusion otherwise is particularly suspect in this case because Soffar "explicitly and adequately" outlined *Strickland* claims in *eight* separate grounds for relief in his habeas petition. *See supra*. It would seem odd for him to have hidden his ninth and tenth claims under the misleading heading of a *Brady* challenge.

Soffar's failure to raise his *Strickland* claims as to the ballistics evidence and Garner's statements in his habeas application is highlighted by the district court's decision to not rule on them. Despite Soffar raising elements of these claims in Appendix B of his summary judgment brief,[45] the district court did not rule on the claims, apparently recognizing that it could not consider claims not raised in the habeas application. *See* 28 U.S.C. § 2242 (providing that a petition for habeas corpus be made in a habeas application); *cf. United States v. Warden of Philadelphia County Prison*, 87 F.Supp. 339, 340 (E.D. Penn. 1949) (holding that until application for writ of habeas corpus is made "no suit has been instituted").

The majority opinion dismisses the district court's decision to not address these claims as irrelevant because "this fact reflects only that the district court, like the state habeas court, simply considered and rejected Soffar's claims of ineffective assistance of counsel without reasons . . . ." Although I do not express an opinion as to whether Soffar raised these claims before the state habeas court, or whether they were silently addressed by that body, the idea that the district court failed to

---

[45] There is no mention of them in the body of the brief.

address these particular claims in a 127 page opinion[46] in which it fully addressed each of Soffar's twenty-four "other" claims is nothing short of fantastic. I also find it hard to believe, as the majority opinion suggests, that the state trial and appellate courts as well as the federal district court each engaged in the irresponsible act of ignoring these claims despite Soffar having "clearly" raised them during each stage of this process.

The district court never ruled on the merits of the *Strickland* claims before us, thus there is no appeal to consider. *See* FED R. APP. P. 22(a) (providing the right to appeal the district court's denial of habeas relief). The role of this Court is to review the decisions of the courts below us, it is not to stand as a court of first instance adjudicating new claims at the will of a petitioner's fancy. *See Zimmerman v. Spears*, 565 F.2d 310, 316 (5th Cir. 1977) ("[T]he Courts of Appeals are not vested with jurisdiction to entertain a petition for a writ of habeas corpus as an original matter."). That role, to the extent that it exists, is reserved to district courts. The majority has confused our separate functions.[47]

## II

The majority opinion does not address Soffar's Sixth Amendment claim because it finds that he was denied effective assistance of counsel. However, because I do not believe relief can be granted on Soffar's phantom *Strickland* claim, I must address the merits of his contention that his Sixth Amendment right to counsel was violated when he was interrogated by a Harris County detective regarding an unrelated sexual assault charge.

---

[46] The state habeas trial court's opinion is 183 pages.

[47] Because I find that Soffar's *Strickland* claims are not properly before this panel, I do not reach the merits of those claims nor do I consider Texas's contention that they were not exhausted in state court.

At some point while Houston Police were interrogating Soffar as to the murders at issue in this case, Soffar, without provocation, confessed to the rape of a woman in Harris County. After charging Soffar with the murders at the bowling alley, Houston Police contacted Harris County Sheriff's Detective Bockel and informed him of Soffar's confession. Detective Bockel contacted the victim in an unresolved rape case and traveled to Houston to interview Soffar. After advising him of his right to silence and counsel, both of which Soffar waived, Bockel interrogated Soffar. During this interrogation, Soffar gave a written confession admitting to the rape of the woman who later identified him.[48]

The victim testified at the punishment phase of Soffar's capital murder trial and identified him as the man who had raped her. Neither Soffar's written confession presented to Detective Bockel, nor evidence of his oral confession given to Houston Police were presented at the trial. Soffar first argues that the testimony is "extraneous offense" evidence that is the fruit of Detective Bockel's illegal interrogation of Soffar in violation of his Sixth Amendment right to counsel. *See Maine v. Moulton*, 474 U.S. 159, 180, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985). Soffar then claims that because this evidence was improperly admitted during the punishment phase of his capital trial, the death penalty was "improperly imposed" in his case. *See Estelle v. Smith*, 451 U.S. 454, 471, 101 S. Ct.866, 68 L. Ed.2d 359 (1981) (holding that the death penalty is "improperly imposed" if evidence obtained in violation of the defendant's Sixth Amendment rights is submitted during the penalty phases of his capital trial). Soffar's Sixth Amendment right to counsel was not violated, therefore, he is not entitled to habeas relief.

As a preliminary matter, the evidence gleaned by police from questioning Soffar about the

---

[48] Soffar was not subsequently charged with the rape, presumably because he was convicted of these murders.

sexual assault offense, including Soffar's confession and the victim's testimony, were admissible in the punishment phase of his capital murder trial, even though he was never formally charged with committing the sexual assault. *See Alabama v. Shelton*, 535 U.S. 654, 665, 122 S. Ct. 1764, 152 L. Ed. 2d 888 (2002) ("Once guilt has been established . . . sentencing courts may take into account not only a defendant's prior convictions, but . . . also [his] past criminal behavior, even if no conviction resulted from that behavior.") (internal quotations omitted).

At the time of the questioning, Soffar's Sixth Amendment right to counsel, an offense-specific right, had not yet attached to the uncharged sexual assault offense. *See Kirby v. Illinois*, 406 U.S. 682, 688-89, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972) (explaining that the Sixth Amendment right to counsel attaches at the initiation of adversarial judicial proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"). As Soffar knowingly and intelligently waived his *Miranda* rights before being questioned by Detective Bockel about the uncharged sexual assault offense, the police were free to question him, without counsel present, about that offense. *See Texas v. Cobb*, 532 U.S. 162, 167, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001) (refusing to extend the Sixth Amendment right to counsel to uncharged offenses, even if they are "factually related" to the charged offenses); *McNeil v. Wisconsin,* 501 U.S. 171, 175-79, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991) (holding that after a defendant's valid *Miranda* waiver, despite the attachment of his Sixth Amendment right to counsel as to another offense, the police are free to question that defendant, without counsel present, about crimes for which he has not yet been formally charged). Therefore, Soffar had no right to counsel with respect to being questioned about the sexual assault.

Soffar's Sixth Amendment right to counsel had, however, attached to the murder charges.

He thus argues that the police officers purposefully "circumvented" his right to counsel as to the murder charges by questioning him as to the sexual assault charge for the purpose of soliciting incriminating statements to be used at the punishment phase of his murder trial. *See Moulton*, 474 U.S. at 180 (prohibiting the knowing circumvention of a prisoner's right to counsel).

Under *Moulton v. Maine*, "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." *Id.* Thus, if, during the interrogation, Soffar had made incriminating statements *pertaining to his capital murder charges*, those statements would have been inadmissible at Soffar's capital murder trial, *if* the State knowingly circumvented Soffar's Sixth Amendment right to counsel. *See id.* at 177 (finding police violated defendant's Sixth Amendment rights when it recorded a telephone conversation knowing defendant would discuss "pending charges").

First, the state habeas court found that during the interrogation Soffar made no incriminating statements pertaining to his pending murder charges. In fact, it found that "the conversation only concerned the sexual assault . . . ." As Soffar made no incriminating statements regarding his murder charge during the interrogation, *Moulton*, by its own terms, is inapplicable. *See id.* at 180.

Second, there is no evidence in the record suggesting that Detective Bockel's purpose in interviewing Soffar was to solicit incriminating statements to be used at Soffar's murder trial. The state habeas court found that: 1) Harris County Sheriff's Detective Bockel interrogated Soffar as to the sexual assault; 2) Soffar was advised of his *Miranda* rights, which he knowingly and intelligently waived and never invoked; 3) Soffar made a written confession to the assault; 4) Detective Bockel's

interrogation was limited to the subject of the alleged sexual assault; and, 5) at the punishment phase

of Soffar's murder trial, the trial judge instructed the jury to consider the evidence of the extraneous

sexual assault for the limited purpose of determining punishment.[49]  It did not find that Bockel's

purpose in interrogating Soffar was to circumvent his right to counsel as to the murder charges or

to gather information that could be used to prosecute those charges.

Further, the record strongly supports the conclusion that Bockel's sole purpose in

interrogating Soffar was to investigate the unsolved rape.  Bockel sought to speak to Soffar only after

he was informed that Soffar had already confessed to a rape in Harris County.  Before Bockel

---

[49] Specifically the state habeas court found:

1) on August 19, 1980, in the presence of Detective Earl Bockel of the Harris County Sheriff's Office, Soffar made a written statement confessing to the sexual assault of [the victim];

2) prior to any alleged interrogation from August 8, 1980 to August 19, 1980, adversarial proceedings against Soffar for the offense of capital murder in the instant case had been initiated; however, no such adversarial proceedings had been initiated against Soffar for the offense of the aggravated sexual assault of [the victim], an extraneous offense introduced into evidence during the punishment phase of Soffar's trial;

3) during the *Jackson v. Denno* hearing in the trial in the primary case, Detective Bockel testified that, on August 19, 1980, he gave Soffar *Miranda* warnings, that Soffar sufficiently understood those warnings, that Soffar specified that he did not want his attorneys present but rather wanted to talk to Detective Bockel only, that the conversation only concerned the sexual assault of [the victim]*,* and that no coercion or threats were made to Soffar to obtain this confession;

4) during the *Jackson v. Denno* hearing in the instant case, the tri al court found that Soffar never invoked his right to counsel, and was repeatedly given *Miranda* warnings and intelligently waived them under no coercion or improper influence from the police both regarding interrogations covering the primary case, as well as interrogations covering the extraneous offense of the sexual assault of [the victim]; and

5) the trial court instructed the jury to consider the evidence of the extraneous sexual assault of [the victim] for the limited purpose of aiding the jury in answering any questions that might be presented in the punishment charge, and also instructed the jury that, before the jury could consider the testimony of the extraneous offense, the jury must find that Soffar committed the extraneous offense beyond a reasonable doubt.

questioned Soffar, he advised him of his Fifth Amendment right to counsel and took Soffar's written confession only after Soffar explicitly waived that right. After taking Soffar's confession, Bockel continued his investigation by bringing the victim down to Houston to identify Soffar in a line-up.[50] Bockel was thus deeply engaged in the sexual assault investigation, before, during, and after his interrogation of Soffar.

There is, however, no evidence suggesting that he was in any way involved in the murder investigation. Bockel was not a member of the Houston Police force, much less a member of the team investigating the murders at the bowling alley. Nor is there any evidence in the record suggesting that Houston Police asked Bockel to solicit incriminating statements to be used at Soffar's murder trial. Soffar's contention otherwise is nothing but unsubstantiated conjecture.

Nothing in the evidentiary record, or the state habeas findings, suggests that Detective Bockel intended to interrogate Soffar for the purpose of gathering additional evidence to a crime he was not investigating. Rather, it demonstrates that his purpose was to gather information regarding an unsolved rape to which Soffar had already confessed to committing. That the evidence Bockel obtained during the interrogation was used during the punishment phases of Soffar's capital murder trial appears to be nothing more than happenstance. *See id.* at 176 ("[T]he Sixth Amendment is not violated whenever) ) by luck or happenstance) ) the State obtains incriminating statements from the accused after the right to counsel has attached.").

Further, the victim's testimony, to the extent that it is the fruit of Soffar's rape confession,

---

[50] Although the victim was unable to conclusively identify Soffar in the live line-up, the use of the line-up further supports the conclusion that Detective Bockel's purpose in interrogating Soffar was to further the investigation of the sexual assault rather than gather evidence for the punishment phase of the murder trial.

is the fruit of his confession to Houston Police, not to Detective Bockel. By the time Bockel interrogated Soffar he had already confessed to the rape. The victim then identified Soffar as the man who raped her during the punishment phase of Soffar's capital trial. Her testimony is the fruit of Soffar's confession to Houston Police, which Soffar does not contend was taken in violation of either his Fifth or Sixth Amendment rights.

The police did not violate Soffar's Sixth Amendment right to counsel because he made no incriminating statements "pertaining to [his] pending charges"; because at the time of his interrogation his Sixth Amendment right to counsel had not attached as to the sexual assault charge; because there is no evidence in the record indicating that the purpose of the interrogation was to circumvent his Sixth Amendment right to counsel as to the murder charges; and, because the victim's testimony was the fruit of his confession to the Houston police, not of his confession during his interrogation by Detective Bockel.

## III

For the foregoing reasons, I respectfully dissent from the majority's decision to remand this case to the district court for entry of an order granting Soffar's petition for writ of habeas corpus and setting aside his conviction and sentence for capital murder.

## APPENDIX A

| Soffar's Written Statement August 7, 1980 | Garner Interview July 17-20, 1980 |
|---|---|
| Latt and I both went inside the bowling alley together. | There was just one robber who entered the bowling alley. |
| Latt had a stocking over his head and I had my shirt pulled up over my face. | The robber wore no disguise and I had an unobstructed view of his face. |
| Latt and I went right in an unlocked front door. | Steve Sims unlocked the front door and let in the robber who had been knocking on the door. |
| We stayed inside of the bowling alley during the entire time we were there. | It appeared that the robber had told Steve he was having car trouble.  He was carrying a water jug that he wanted to fill up, and the robber and Sims went back outside together. |

## APPENDIX A

| Soffar's Written Statement<br><br>August 7, 1980 | Garner Interview<br><br>July 17-20, 1980 |
|---|---|
| As soon as we walked in, Lat grabbed the first guy we saw by the hair (the dude, who according to Soffar, ended up lying farthest from the front door, i.e, Tommy Temple) and made him get down on his knees.  The other three people saw this and they walked up to see what was going on. | When Sims and the same robber guy came back inside, I walked up from bowling on lanes 25/26 to see what was going on.  The robber asked Sims if anyone else was there, and Sims called Temple and Felsher up to the front. |
| The girl screamed and kept screaming.  Latt kicked her, and he also kicked the second dude (Sims) because he kept looking up. | No one, not even the girl, screamed or said anything, and the robber never hit, kicked, or touched anyone. |

## APPENDIX A

| Soffar's Written Statement<br><br>August 7, 1980 | Garner Interview<br><br>July 17-20, 1980 |
|---|---|
| Latt fired a warning shot, and there were four more shots fired after that. (Latt shot the first two guys from behind, in position 3 and 4, then he threw the gun to me. he made me shoot Garner from behind, position 1, and I walked around in front of Felsher and he made me shoot her in cheek, position 2)[51] | I think there were four shots total. The same lone robber shot us all, one right after another. Felsher was in position 1, Sims in position 2, I was in position 3, and Temple was in position 4. |

---

[51]The numbered positions correspond to the victims' relative proximity to the front door, with position 1 being closest to the front door (i.e., where Garner was found), and position 4 being farthest from the door (i.e., where Temple's body was found).

| Soffar's Written Statement August 7, 1980 | Garner Interview July 17-20, 1980 |
|---|---|
| The victims' positions at the time of the shootings were male, female, male, male. Latt shot Sims first in position 3, then he shot Temple in position 4. Next, I shot Garner in position 1, and then I shot Felsher when she was in position 2. | The body positions at the time of the shootings were female, male, male, male. I got up and made a call to my mother, and then the manager called me. I then went back and laid down next to the female, assuming a position closest to door (thus changing the body configuration to male, female, mail, male). |
| I went around and emptied the cash register *after* the shootings. | Before the shootings, the robber asked if I could open the register and I said, "I don't know how," so the robber made Steve go around behind the counter and empty register while he stayed in front of counter with his gun on us. He then made Steve come back around and lie down. Then the robber shot us all. |

## *APPENDIX A*

| Soffar's Written Statement<br><br>August 7, 1980 | Garner Interview<br><br>July 17-20, 1980 |
|---|---|
| Latt emptied the victims' pockets to get their wallets *after* the shootings. | The robber asked me for my wallet when I first approached him and I told him I didn't have it. But later, when we were all lying on the ground, the robber made us all empty our pockets and put our wallets above our heads, so I did. Right after we did this, he shot us all.[52] |

_____

[52]This information was derived from Garner's hypnotic interview on August 21, 1980.

I shot the 3RD male

3RD Bama here fine

I shot the girl last

4 M

1ST Lat Shot wither the First one 2 other

2

2ND Lat Shot the Second one

August 7, 1980
Max Soffar
Time 9:30pm

R.D Cain 0-724 8-7-80  9:33Pm
M.F.K. 4th D426 8-7-80